658 S.E.2d 80

**James W. FIELDS and Rosemary L. Fields, Appellants,**

v.

**J. HAYNES WATERS BUILDERS, INC., Mahoney Brothers, Inc., and Dryvit Systems, Inc., Defendants,**

**of whom J. Haynes Waters Builders, Inc., is Respondent.**

No. 26443.

Supreme Court of South Carolina.

Heard Dec. 4, 2007.

Decided Feb. 25, 2008.

546

548

550

Charles A. Krawczyk, William R. Padget, and Robert "Sam" Phillips, all of Finkel Law Firm, of Columbia, for Appellants.

John L. McCants, of Ellis Lawhorne & Sims, of Columbia, for Respondent.

Chief Justice TOAL:

This is a direct appeal in a civil case arising out of the allegedly defective construction of a residence. Although the jury returned a verdict in favor of Appellants James and Rosemary Fields, the Fields appealed arguing that the trial court committed several errors relating to the admission of expert testimony, the admission of evidence, and the jury charges. The Fields further argue that the trial court erred in failing to order a new trial, a new trial nisi additur, or grant judgment not withstanding the verdict. We find that the trial court by and large committed no errors, and that where the trial court did err, the errors were harmless. Accordingly, we affirm.

## FACTUAL/PROCEDURAL BACKGROUND

This case arises out of the allegedly defective construction of a residence purchased by Appellants James and Rosemary Fields ("the Fields") in 1999. The Fields are not the original owners of the home in question, but purchased the home from the owners who built the home some eight years earlier. At the time the Fields purchased the home, the exterior of the home was clad with a synthetic stucco material commonly known as an exterior insulation and finish system or E.I.F.S.

Roughly two years after purchasing the home, the Fields became aware of potential moisture intrusion problems associated with E.I.F.S.-clad homes. The Fields contacted a law firm, and the law firm put the Fields in contact with inspectors and investigators who determined that the E.I.F.S. on the Fields' home was allowing moisture to enter the home which was causing significant damage to the structure.

The Fields sued Respondent J. Haynes Waters Builders, the builder of the home ("the Builder"); Dryvit Systems, Inc., the manufacturer of the E.I.F.S. used on the home; and Mahoney Brothers, Inc., the subcontractors who installed the

E.I.F.S. Roughly two months prior to trial, the parties attempted to resolve the case through mediation. During mediation, the Fields settled their claims against Dryvit and Mahoney Brothers. Thus, by the time of trial, the Builder was the only remaining defendant.

At bottom, several issues in this appeal arise out of the Fields' decision to repair their home prior to trial. The parties entered into two separate scheduling orders leading up to the trial in this case, and the scheduling order in effect during the summer of 2004 called for discovery to end by August 1st and set the matter for trial on or after October 4th. On July 30th, two days before discovery was to be complete, the Fields notified the defendants of their intention to immediately remove the E.I.F.S. from the home.

Prior to trial, the Builder sought to exclude a great deal of testimony and evidence related to the inspections and repairs of the Fields' home. As a basis for excluding the removal and repair costs from trial, the Builder asserted that the Fields violated the scheduling order by removing the E.I.F.S. and repairing the home past the order's discovery deadline. As a basis for preventing the initial inspector of the home and the repair contractor from testifying, the Builder argued that both the inspector and the general contractor had violated South Carolina's laws relating to the licensing and permissible work of home inspectors and general contractors. While the trial court permitted the Fields' repair contractor to testify and admitted the evidence of removal and repair costs, the trial court found that the initial inspector of the Fields' home was not qualified to testify as an expert.

The Builder also sought extensive discovery regarding the costs of the repairs to the Fields' home. The parties' seeking of discovery beyond the deadline set in the scheduling order became the subject of considerable disagreement prior to and during trial. This disagreement resulted in several motions to compel discovery and in the trial court's admission and exclusion of several items of evidence and types of testimony. Most notably, the trial court allowed the Builder to present expert testimony analyzing the repair costs the Fields incurred in removing the E.I.F.S. from their home. This testi-

mony included an analysis of the Fields' repair contractor's material costs, overhead, and profit margin.

The case went to trial in March 2005. Although the Fields asserted eight causes of action in their complaint, the Fields tried the case on causes of action for negligence, breach of express warranties, breach of the implied warranty of workmanlike service, and strict liability.[1] At the close of the Fields' case in chief, the trial court granted the Builder a directed verdict as to the Fields' express warranty and strict liability claims. The case proceeded to verdict on the claims for negligence and breach of the implied warranty of workmanlike service, and the jury returned a verdict in favor of the Fields. The jury awarded $6,000 in damages, and the Fields appealed.

This Court certified the case from the court of appeals pursuant to Rule 204(b), SCACR, and the Fields raise the following issues for review:

I. Did the trial court err in (A) failing to qualify one of the Fields' potential witnesses as an expert on the basis that the witness failed to comply with South Carolina's home inspection licensing requirements, or (B) excluding a second bid for the repair of the Fields' home as inadmissible hearsay?

II. Did the trial court err in charging the jury (A) that a general contractor is not automatically liable for the negligence of a subcontractor, (B) regarding the licensing requirements for home inspectors and general contractors, or (C) regarding the acceptance of a product with a patent defect?

III. Did the trial court err in directing a verdict in favor of the Builder on the Fields' claim for strict liability?

IV. Did the trial court err in allowing testimony and evidence regarding the Fields' repair contractor's costs and profit margin?

---

1. In addition to these four causes of action, the Fields originally asserted claims for breach of the implied warranties of habitability, merchantability, and fitness for a particular purpose, as well as a claim for unfair trade practices. The trial court granted the Builder summary judgment on these claims roughly one month prior to trial.

V. Did the trial court err in failing to order a new trial, a new trial nisi additur, or grant judgment notwithstanding the verdict?

LAW/ANALYSIS

## I. Exclusion of Testimony and Evidence

### (A) The Inspector's Qualification as an Expert

■ The Fields argue that the trial court erred in finding that Bill Flaherty, the initial inspector of the Fields' home, was not qualified to testify as an expert witness on the basis that Flaherty failed to comply with South Carolina's home inspection licensing requirements. We agree, but we ultimately find that the error was harmless.

■■ A person may be qualified as an expert based upon "knowledge, skill, experience, training, or education." Rule 702, SCRE. The qualification of a witness as an expert is a matter largely within the trial court's discretion and will not be reversed absent an abuse of that discretion. *Gooding v. St. Francis Xavier Hosp.*, 326 S.C. 248, 252, 487 S.E.2d 596, 598 (1997). An abuse of discretion occurs when the trial court's decision is based upon an error of law or upon factual findings that are without evidentiary support. *Id.*

Our fairly recent decision in *Baggerly v. CSX Transportation, Inc.*, is instructive. 370 S.C. 362, 635 S.E.2d 97 (2006). In *Baggerly*, this Court addressed a conflict between Rule 702's qualifications for experts and a statute that defined the practice of engineering to include the offering of expert technical testimony. *Id.* at 374–75, 635 S.E.2d at 103–04. Although the Court noted that the practice of engineering statute appeared to contain more specific requirements regarding expert testimony than Rule 702, the Court held that it would not interpret the statute to require that a person offering expert testimony in the field of engineering be licensed as a professional engineer. *Id.* In the Court's words, a contrary interpretation would "radically alter[ ]" the landscape of qualifying expert testimony. *Id.*

■ This case throws an important aspect of our decision in *Baggerly* into sharp focus. *Baggerly* properly recognizes that

local licensing requirements are arguably inconsistent with Rule 702's operational framework for expert testimony. Rule 702 does not contain a set of mandatory qualifications that a witness must meet in order to be qualified as an expert. Instead, Rule 702 recognizes that there are a variety of ways in which a person can become so skilled or knowledgeable in a field that their opinion in a scientific, technical, or specialized area can assist the trier of fact in determining a fact or in understanding the evidence. Because a specific licensing requirement is potentially inconsistent with the variety of ways a person may gain specialized knowledge, *Baggerly* recognizes that a trial court's decision to refuse to qualify a person as an expert based solely on the failure to meet a licensing requirement arguably impairs the truth-seeking function of courts.

 At the same time, however, this Court's jurisprudence emphasizes the role of the trial court as the gatekeeper in determining both the qualifications of an expert and whether the expert's testimony will assist the trier of fact. *See State v. Council*, 335 S.C. 1, 20, 515 S.E.2d 508, 518 (1999). While *Baggerly* makes it clear that non-compliance with licensing requirements or with the statutory law in specialized areas should not require, *a fortiori*, a trial court to refuse to qualify a witness as an expert, *Baggerly* does not stand for the proposition that a trial court should not consider these factors when judging a purported expert's qualifications. Instead, *Baggerly* supports the notion that in determining a witness's qualification as an expert, the trial court should make an inquiry broad in scope. Specifically, the trial court ought to take into account the factors delineated in the rules of evidence, the statutory law, and any other sources of authority that may be relevant to a purported expert witness's level of skill or knowledge; and the trial court must further determine whether the offered testimony will assist the trier of fact. In this case, the trial court appears to only have considered the fact that Flaherty did not have the required license from the State of South Carolina. In our view, the trial court cannot have such a solitary focus. Although lack of licensing and violations of statutory law may often coincide with a lack of specialized skill or knowledge, these attributes are not always

bedfellows.[2]

Accordingly, we hold that the trial court abused its discretion in failing to qualify Flaherty, the initial inspector of the Fields' home, as an expert.

This finding does not end our analysis on this issue, however, because to warrant reversal based on the admission or exclusion of evidence, the appealing party must show both the error of the ruling and prejudice. *Fields v. Reg. Med. Ctr. Orangeburg*, 363 S.C. 19, 26, 609 S.E.2d 506, 509 (2005). Prejudice is a reasonable probability that the jury's verdict was influenced by the challenged evidence or the lack thereof. Id. In this case, the Builder argues that if the trial court erred in finding that Flaherty was not qualified to testify as an expert, the error was harmless because the expert's testimony would have been cumulative. We agree.

At trial, the Fields presented the testimony of their repair contractor, David Bennett. The trial court qualified Bennett as an expert in residential home building and in E.I.F.S. application, and Bennett testified that the E.I.F.S. on the Fields' house allowed a substantial amount of moisture into the home, that the E.I.F.S. had to be removed to determine the extent of the damage, that he had never seen E.I.F.S. installed correctly, and that the Builder breached the standard of care for a general contractor in several particulars. The Fields also presented the testimony of a forensic architect, Dale Marshall, at trial. The trial court qualified Marshall as an expert in the standard of care for general contractors and in the area of forensic examination and repair of residential construction. Marshall provided testimony that was substantially similar to Bennett's and he specifically testified that the Fields' decision to remove the E.I.F.S. from their home was reasonable.

---

2. The Fields have argued both at trial and on appeal that Flaherty is a specialty inspector and is thus not required to have a home inspector's license to perform inspections of the type he performed for the Fields. Because compliance with licensing requirements should not be determinative of a purported expert's qualifications, the question of whether Flaherty is actually required to have a home inspector's license is irrelevant.

The record suggests that had he been qualified as an expert, Flaherty would have testified that the E.I.F.S. was allowing moisture to enter and damage the Fields' home, that the Builder failed to properly install the E.I.F.S., and that it was necessary for the Fields to remove the E.I.F.S. from their home. This testimony clearly would have been cumulative to the testimony of both Bennett and Marshall. Beyond the plain similarities of the testimonies, this conclusion is further exhibited by the fact that following the trial court's ruling that Flaherty was not qualified to testify as an expert, the Fields argued that Marshall would testify to "essentially the same things" found in Flaherty's report. It is also instructive that although the trial court ruled that Flaherty could not testify as an expert, the trial court additionally ruled that other experts would be permitted to say that they relied on his report in reaching their conclusions.

Accordingly, we hold that the trial court erred in refusing to qualify Flaherty as an expert witness, but that the error was harmless.

### (B) The Second Repair Estimate

■ The Fields argue that the trial court erred in excluding a second estimate for the Fields' home repairs as inadmissible hearsay. We disagree.

Rule 801(c), SCRE, defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Hearsay is not admissible except as provided by the rules of evidence or other rules prescribed by this Court or by statute. Rule 802, SCRE.

Part of the Builder's strategy at trial was to attack the reasonableness of the costs the Fields incurred in removing the E.I.F.S. and in repairing the home. To combat this effort, the Fields sought to introduce, through the testimony of James Fields, evidence regarding the amount of an alternative estimate for the removal and repair work on the Fields' home. The trial court excluded the evidence, reasoning that the alternative estimate was hearsay when offered through James Fields. On appeal, the Fields argue that the alternative

estimate is not hearsay, but is a statement containing non-hearsay "words of contract."

The Fields' argument based on "words of contract" derives from the principle that not all words or utterances are offered for the truth of the matter asserted. 6 John Henry Wigmore, EVIDENCE IN TRIALS AT COMMON LAW § 1766 (1976) [hereinafter WIGMORE ON EVIDENCE]. For example, in some scenarios, words or utterances themselves from an out of court declarant may, regardless of their truth, accompany an ambiguous act and give the act legal significance, be used circumstantially, such as to show a state of mind, or form part of an issue in a case. *Id.*

Traditionally "words of contract" were excluded from the prohibition of hearsay as utterances containing specific words forming part of the issue. WIGMORE ON EVIDENCE § 1770. Examples of such words or utterances include words accompanying the making of a contract, utterances evidencing a promise to marry, words accompanying the performance of a contract, words charged as a libel or slander, words evidencing the fact of sending notice, and words evidencing reputation. *Id.* Again, these words or utterances are not defined as hearsay because they are not offered to prove the truth of the matter asserted. *Id.* Instead, their utterance is itself a part of the issue litigated. *Id.*

In this case, it is clear that the second estimate for the Fields' home repairs, provided by a company called Prime South, does not qualify as non-hearsay "words of contract." We believe it is instructive to focus on two aspects of this issue. First, the Fields did not enter into a contract with Prime South. Thus, because no contract exists between these parties, there can be no verbal assertions offered to interpret a contract. But more importantly, the issue regarding the Fields' repair costs is not whether the Fields believed the costs were reasonable, but whether the costs were in fact reasonable, and whether the Fields exercised due care in determining that the costs were reasonable. *See May v. Hopkinson*, 289 S.C. 549, 559, 347 S.E.2d 508, 514 (Ct.App. 1986) (recognizing that the reasonable cost of repairs is competent and probative evidence on the issue of damages).

The relevant question in the hearsay analysis is what the Prime South document is offered to assert. The document is not offered as proof that Prime South simply offered to repair the Fields' home. Instead, the Fields offered the document to show that Prime South offered to repair the home for a specific price and that the price offered was reasonable. This assertion is classic hearsay when offered by an out of court declarant, and the trial court properly excluded the statement from evidence.

Accordingly, we hold that the trial court did not err in excluding a second bid for the Fields' home repairs.

## II. Jury Charges

 A jury charge is correct if the charge, when read as a whole, adequately covers the current and correct law. *Keaton ex. rel. Foster v. Greenville Hosp. Sys.*, 334 S.C. 488, 495–96, 514 S.E.2d 570, 574 (1999). To warrant reversal on appeal, the trial court's instructions must be not only erroneous, but must also be prejudicial. *Id.*

### (A) General Contractor's Standard of Care

 The Fields argue that, in South Carolina, a general contractor is "automatically responsible" for the negligence of a subcontractor. We disagree.

In the context of their cause of action for negligence, the Fields' argument on this issue seems misguided. The Fields argue that the trial court should have charged a theory of automatic liability, but that the trial court also properly charged the jury that "[a]ny failure to exercise due care on the part of [the Builder] ... would constitute negligence;" that "[a] builder who undertakes construction of a building impliedly represents that he possesses and will exercise a reasonable degree of skill usually possessed by a member of the building occupation;" and that "[a] builder who undertakes to supervise the construction of a building is under a duty to exercise reasonable care and such supervision to see that the work is done in conformity with the applicable building code ... and in a good and workmanlike manner." In our view, it would have been wildly inconsistent for the trial court to charge that a general contractor must exercise only the de-

gree of care reasonably expected in the industry in constructing and supervising the construction of the Fields' home, and in the same breath to have charged that a general contractor is automatically liable for any negligence associated with the construction. Liability attaching "automatically," in our opinion, seems more like strict liability than negligence.

The Fields' argument on this issue appears more applicable in the context of their claim for breach of the implied warranty of workmanlike service. Beginning in *Rutledge v. Dodenhoff*, 254 S.C. 407, 175 S.E.2d 792 (1970), and extending through this Court's jurisprudence as evidenced in *Lane v. Trenholm Bldg. Co.*, 267 S.C. 497, 229 S.E.2d 728 (1976), and *Kennedy v. Columbia Lumber & Mfg. Co., Inc.*, 299 S.C. 335, 384 S.E.2d 730 (1989), this Court has embraced the notion that in constructing a home, a builder warrants that the home is fit for its intended use as a dwelling, that the home was constructed in a workmanlike manner, and that the home is free of latent defects. This warranty extends not only to the original purchasers of the home, with whom the builder is in privity, but to subsequent purchasers who may pursue a cause of action in contract or tort against a builder for a reasonable period after the home's construction. *Terlinde v. Neely*, 275 S.C. 395, 397, 271 S.E.2d 768, 769 (1980).

The flaw in the Fields' argument on this issue is a result of their incorrect blending of the trial court's charges on negligence with this Court's jurisprudence in the area of warranty liability regarding the sales of homes. Regarding the warranty of workmanlike service, the trial court charged the jury that a builder must build a home "in an ordinarily skillful manner as a skilled workman would do the work," and that "[t]he builder is required to complete the construction that is expected of living quarters of comparable kind and quality." Just as the trial court's charges on negligence correctly stated the law of negligence, these charges correctly stated the law regarding the warranty of workmanlike service. By using this Court's warranty jurisprudence to analyze the trial court's charges on negligence, the Fields' improperly assert that the trial court's charges were inaccurate. In the instant case, the trial court charged the jury that the Builder was required to construct a home commensurate with the

standard expected of living quarters. As we have outlined, this properly stated the law of workmanlike service.

A final point is instructive regarding these jury charges. In the instant case, two central issues at trial were the identification of the standards of care for a general contractor supervising the application of E.I.F.S. and whether the damage caused by moisture intrusion into the Fields' home was the result of contractor negligence, a design defect, or the Fields' failure to maintain the home. The parties presented conflicting testimony regarding each of these questions. While the Fields' experts testified that E.I.F.S. was a defective product and thus required perfect caulking and sealing, the Builder provided expert testimony that it supervised the installation of the E.I.F.S. in accordance with the building code applicable at the time, in a manner consistent with the manufacturer's instructions and in the industry at the time, and that the vast majority of the damage was attributable to the Fields' failure to maintain their home. In this case, the trial court's charges to the jury accurately summarized the law, and appropriately left to the jury the tasks of determining the appropriate standard of care and the cause of the damage to the Fields' home.

Accordingly, we hold that the trial court did not err in charging the jury regarding the standard of care for a general contractor.

(B) Licensing Requirements for Inspectors and Contractors

■■■ The Fields argue that the trial court erred in charging the jury regarding the licensing requirements for home inspectors and general contractors. We disagree.

One of the Builder's primary strategies at trial was to attack the Fields' experts, their qualifications, and the contractors that the Fields used to repair their home. The trial court ultimately charged the jury regarding several licensing requirements applicable to home inspectors, general contractors, and subcontractors in South Carolina. These statutes dealt specifically with statutory requirements for a home inspection report identifying a construction defect in a home, the statutory prohibition of a person who identifies a defect in a home

inspection from performing repair work on the home, and the use and supervision of unlicensed specialty subcontractors.

■■ Of course, it was completely reasonable for the Builder to attack the Fields' experts by raising questions regarding their compliance with the statutory and regulatory law. *See Peterson v. Nat'l. R.R. Passenger Corp.*, 365 S.C. 391, 399, 618 S.E.2d 903, 907 (2005) (recognizing that defects in an expert witness's education and experience go to the weight of the expert's testimony). Thus, it was also proper for the trial court to charge the jury as to the statutory law in these areas. That a witness has been qualified as an expert does not mean that the witness's credibility and the accuracy of his conclusions are beyond reproach. If the statutory law provides a rubric by which an expert's credibility may be judged, it is proper for the jury to use the statutes to make credibility determinations.

Accordingly, we hold that the trial court did not err in charging the jury regarding the licensing requirements for home inspectors and contractors.

## (C) Patent Defects Charge

■■ The Fields argue that the trial court erred in charging the jury regarding the law of acceptance of patent defects. We disagree.

The portion of the trial court's charge to which the Fields object occurred during the trial court's charges regarding the Builder's statute of limitations defense. The trial court charged the jury that the law requires a plaintiff to bring a claim for breach of the implied warranty of workmanlike service within three years of when the plaintiff either knew or through the exercise of reasonable diligence should have known that he had a claim. In this context, the trial court charged the jury that a person who accepts property with a patent defect waives claims arising out of that defect, and that the law thus only protects the purchaser from defects that a reasonably careful inspection would not reveal.

This charge was relevant to the Builder's defense that if the E.I.F.S. on the Fields' home was allowing moisture to enter the home, a pre-purchase home inspection would have discovered this latent defect. The Builder argued that by failing to

have the home inspected prior to purchasing the home, the Fields were barred from suing on the breach of warranty cause of action by the three year statute of limitations. The parties offered conflicting testimony at trial as to the circumstances leading up to the Fields' purchase of the home. While the Fields testified that the Builder met them at the home with the original owners, conducted a detailed walk-through of the home, and made several representations about the quality of the home, the Builder testified that he lived in the same neighborhood and that his interaction with the Fields was simply a chance encounter between future neighbors.

As this review of the evidence and arguments at trial demonstrates, the parties disputed whether the Builder made representations which caused the Fields to forego having the home inspected prior to their purchasing it and whether the Fields were themselves unreasonable in failing to have the home inspected prior to purchase. In light of these disputes, the trial court's charge was relevant to an issue in the case, and the charge was not otherwise confusing or misleading.

Accordingly, we hold that the trial court did not err in charging the jury regarding the law of acceptance of patent defects.

### III. Strict Liability

The Fields argue that the trial court erred in directing a verdict in favor of the Builder on the Fields' claim for strict liability. We disagree.

The trial court may direct a verdict in favor of a party where there are no material facts in dispute and the case presents only a question of law. Rule 50(a), SCRCP; *AMA Mgmt. Corp. v. Strasburger*, 309 S.C. 213, 221, 420 S.E.2d 868, 873 (Ct.App.1992). The question of whether South Carolina's strict liability statute covers a general contractor supervising the construction of a home is a question of law, and this Court reviews questions of law de novo. *Catawba Indian Tribe v. State*, 372 S.C. 519, 524, 642 S.E.2d 751, 753 (2007).

In pertinent part, the strict liability statute provides that "[o]ne who sells any product in a defective condition ... is subject to liability for physical harm caused to the ultimate user or consumer, or to his property, if [t]he seller is in the

business of selling such a product." S.C.Code Ann. § 15–73–10 (2005). In South Carolina, it is firmly established that the strict liability statute applies only to sales of products and not to the provision of services. *See In re Breast Implant Prod. Liab. Litig.*, 331 S.C. 540, 546, 503 S.E.2d 445, 448 (1998) (citing *Samson v. Greenville Hosp. Sys.*, 297 S.C. 409, 377 S.E.2d 311 (1989)). For this reason, the relevant question in this case is whether a contractor provides a product or services.

In determining whether certain types of vendors or professionals offer services or products within the meaning of the strict liability statute, this Court has focused on the character of the underlying transaction, the law regarding similar transactions in other jurisdictions, and the policy arguments in favor of imposing strict liability in a given situation. This Court has determined that both pharmacists who fill prescriptions pursuant to a physician's instructions and health care providers who perform breast implant procedures offer services and are thus not subject to liability under the strict liability statute. *See Madison v. Am. Home Products Corp.*, 358 S.C. 449, 456, 595 S.E.2d 493, 496 (2004) (pharmacists); *In re Breast Implant Prod. Liab. Litig.*, 331 S.C. at 551, 503 S.E.2d at 451.[3]

In our view, a general contractor building a home performs a service and does not sell a product. Professors Prosser and Keeton have recognized that "[t]he transaction of the building contractor has generally been regarded as a transaction involving the rendition of a service," and that for these reasons, strict liability is generally inapplicable to a general contractor. W. Keeton et al., PROSSER AND KEETON ON THE LAW OF TORTS § 104A (5th ed.1984). The professors note that this is true "even though the result of the [contractor's] service is to supply a structure or building to the owner." *Id.*[4]

---

3. As this Court has noted, authority from other jurisdictions interpreting the principles espoused in the Restatement (Second) of Torts § 402A is persuasive in this determination since the General Assembly, in adopting § 15–73–10, codified the Restatement section nearly verbatim.

4. The court of appeals relied on this authority in the case *Duncan v. CRS Sirrine Engineers, Inc.*, 337 S.C. 537, 524 S.E.2d 115 (Ct.App.

The Fields have not provided any persuasive authority from a foreign jurisdiction interpreting a strict liability statute or similar common law rule to cover a general contractor who builds a home. Although it appears that the Supreme Court of Nevada adopted this interpretation at one time, *see Worrell v. Barnes*, 87 Nev. 204, 484 P.2d 573, 576 (1971), the court has since abandoned that rule. *See Calloway v. City of Reno*, 116 Nev. 250, 993 P.2d 1259, 1272 (2000). The Nevada court's reasons for abandoning the rule announced in *Worrell* are instructive.

The Nevada court noted that tracing a defective product used in a home to a manufacturer or a supplier generally poses no significant problem. *Id.* at 1271. This is distinguishable, the court observed, from the situation encountered with the remote manufacturer of a product traveling in interstate commerce. *Id.* The Nevada court further noted that a builder is generally not able to limit his liability by warranties and disclaimers, and that most buildings are one-of-a-kind, requiring methods and materials that change with each product. *Id.* For these reasons, the Nevada court held that the marriage of a contractor with the strict liability encompassed by Restatement § 402A was best discarded.

That the application of the strict liability statute to a contractor is unnecessary is exhibited by returning to an examination of this Court's jurisprudence regarding the implied warranties that attach to the construction and sale of a home. As *Kennedy, Lane,* and *Rutledge* recognize, implied warranties ensure that a homebuilder in South Carolina is liable for a reasonable period of time for latent defects in the home which impact the home's suitability as a residence. Given this extension of liability, liability under the strict liability statute seems superfluous in this arena.

Accordingly, we hold that the trial court did not err in directing a verdict on the Fields' claim for strict liability.

---

1999). In that case, the court of appeals held that a worker who fell through an open hatch on a catwalk had no strict liability claim against the contractor who assembled the catwalk. *Id.* at 543 n. 3, 524 S.E.2d at 118 n. 3. The court of appeals held that assembly work amounted to providing a service rather than a product. *Id.*

## IV. Testimony Regarding Contractor Costs & Profit Margin

██ The Fields argue that the trial court erred in admitting evidence of the Fields' repair contractor's costs and profit margin. We disagree.

██ The admission or exclusion of evidence is left to the sound discretion of the trial court, and the court's decision will not be reversed absent an abuse of discretion. *Fields,* 363 S.C. at 25–26, 609 S.E.2d at 509.

The first argument the Fields present on this issue is that the entire subject matter of the Fields' repair contractor's material costs, profit margin, and other component costs should have been excluded as prejudicial, confusing, and misleading. The Fields assert that they did not have access to this information when hiring the repair contractor, and that it is thus unfair to allow the reasonableness of the repair costs to be judged by the amounts of these component costs. In our view, these arguments are inaccurate.

The critical issue regarding the Fields' repair costs was the reasonableness and necessity of those costs. Accordingly, the fact that the Fields did not have access to Bennett's material costs, overhead, and profit margin is irrelevant to a determination of whether Bennett's costs were reasonable and necessary. Again, the relevant question is not whether the Fields believed that Bennett's costs were reasonable, but whether the costs were in fact reasonable. *See May,* 289 S.C. at 559, 347 S.E.2d at 514 (recognizing that the reasonable cost of repairs is competent and probative evidence on the issue of damages).

The testimony resulting from an examination of Bennett's component costs illustrates the usefulness of this information. The Builder's expert estimator testified that he examined Bennett's materials invoices, purported profit margin, and overhead for the Fields' repairs, and that although the expert's examination of this information resulted in similar figures for the job's sunk costs, the Fields paid Bennett roughly $37,000 more than the job should have cost given Bennett's profit and overhead. While the Fields correctly recognize that the Builder could have used (and indeed did use) another contractor to offer additional testimony as to reasonable repair

costs, the trial court did not abuse its discretion in adding an analysis of Bennett's component costs to this equation.

■ As a second argument on this issue, the Fields argue that the trial court erred in admitting the report prepared by Steve Wilkinson, the Builder's estimating expert, regarding the Fields' repair costs. Again, we disagree.

The Fields argue that the report should have been excluded at trial because the Builder first provided the Fields with the report on the day that Wilkinson was to testify. To combat this claim, the Builder argues that the report was based solely on a comparison of Bennett's invoices and an accepted estimating resource, and that the Builder had been provided with Bennett's invoices the Friday before trial. Thus, the Builder argues that the raw information supplying the basis for the report was in the Fields' possession throughout the course of the litigation, and that the expert had been working to prepare the report until the date of his testimony. In addition to these arguments, the Builder argues that pursuant to a prior discovery order entered in the litigation, the Builder did not have to supply the Fields with any additional discovery.

In our view, the Fields cannot demonstrate that the introduction of Wilkinson's report was prejudicial.[5] First, because an expert is permitted to base opinion testimony on information that is not admissible in evidence, see Rule 703, SCRE, exclusion of the report would not necessarily have impacted Wilkinson's ultimate opinions regarding his view of a reasonable fee in the instant case. Second, the Fields had the opportunity to cross-examine Wilkinson regarding his report and conclusions, re-call their experts in rebuttal, and also could have asked for a short recess or overnight continuance to prepare for cross-examination. In these circumstances, the Fields were not, as they assert they were, precluded from presenting expert testimony commenting on Wilkinson's methodology. Accordingly, a finding of prejudice from the introduction of Wilkinson's testimony seems to us a tall order.

For these reasons, we hold that the trial court did not err in admitting the Fields' repair contractor's costs and profit. We

---

5. On this issue, we assume, without deciding, that the trial court erred in admitting Wilkinson's report. In our view, the prejudice analysis in this case is rather simple.

further hold that if the trial court erred in admitting the report prepared by the Builder's estimating expert, the error was harmless.

## V. New Trial, New Trial Nisi Additur, or J.N.O.V.

■ The Fields argue that the trial court erred in failing to order a new trial, a new trial nisi additur, or grant judgment notwithstanding the verdict. We disagree.

■ The decision to grant or deny a motion for a new trial rests within the sound discretion of the trial court, and the trial court's decision will not be disturbed absent an abuse of discretion. *S.C. State Highway Dep't v. Clarkson*, 267 S.C. 121, 126, 226 S.E.2d 696, 697 (1976). On this issue, the Fields primarily argue that the jury's verdict was grossly inadequate in light of the evidence presented at trial. In our view, the Fields do not accurately describe the evidence.

There is ample evidence in the record supporting the jury's verdict. The Fields correctly point out that the Builder, during cross-examination, admitted liability for one area of damage caused by poorly installed flashing, but this was not the full extent of the Builder's testimony. The Builder also opined that only five percent of the house had damage from moisture and that roughly three-quarters of the damages to the home was caused by the Fields' failure to maintain the home. Furthermore, the Builder's estimating expert opined that removing and replacing the E.I.F.S. from all the areas for which the Builder was responsible should have cost approximately $124,000. It was, of course, possible for the jury in this case to conclude, consistent with this testimony, that only five percent of the house had damage and that the calculations offered by the Builder's estimating expert represented reasonable repair costs. It was thus possible for the jury to arrive at an award of $6,000 based on evidence presented at trial in this case.[6]

---

6. Five percent of $124,000 is actually $6,200. We can only speculate as to whether the jury performed this or some similar calculation based on the evidence admitted at trial in this case. The calculation does, however, exhibit that there is evidentiary support for the jury's award.

Accordingly, we hold that the trial court did not err in failing to order a new trial, a new trial nisi additur, or grant judgment not withstanding the verdict.

## CONCLUSION

For the foregoing reasons, we affirm the trial court's decision. We specifically hold that:

(1) the trial court erred in refusing to qualify Flaherty as an expert witness, but that the error was harmless;

(2) the trial court did not err in excluding a second bid for the repair of the Fields' home as inadmissible hearsay;

(3) the trial court did not err in charging the jury that a general contractor is not automatically liable, in negligence, for the negligence of a subcontractor;

(4) the trial court did not err in charging the jury regarding the licensing requirements for home inspectors and contractors;

(5) the trial court did not err in charging the jury regarding the law of acceptance of patent defects;

(6) the trial court did not err in directing a verdict in favor of the Builder on the Fields' claim for strict liability;

(7) the trial court did not err in admitting evidence of the Fields' repair contractor's costs and profit margin;

(8) assuming the trial court erred in admitting the report prepared by the Builder's estimating expert, the error was harmless; and

(9) the trial court did not err in failing to order a new trial, a new trial nisi additur, or grant judgment notwithstanding the verdict.

MOORE, WALLER, BEATTY, JJ., concur.

PLEICONES, J., concurring in result only.