696 S.E.2d 599

William C. MORRIS, Jr., and William Robert Morris, Respondents,

v.

TIDEWATER LAND & TIMBER, INC., and Leon E. Fonvielle, II, Appellants.

No. 4703.

Court of Appeals of South Carolina.

Heard March 3, 2010.

Decided June 30, 2010.

---

2. Boggs did not appeal his conviction or fifteen-year sentence.

318 

Reynolds Williams and Walker H. Willcox, both of Florence, for Appellants.

William P. Hatfield, of Florence, for Respondents.

GEATHERS, J.

This action for an accounting arises out of the 2003 dissolution of Tidewater Land and Timber, Inc. (Tidewater), a corporation in which Leon E. Fonvielle, II (Chuck), William Robert Morris (Robert), and William C. Morris, Jr. (William) were the equal and sole shareholders. On appeal, Tidewater and Chuck challenge the special referee's judgment awarding Robert and William each $90,897.35 and finding against Tidewater and Chuck on their counterclaim. We affirm as modified.

## FACTUAL/PROCEDURAL BACKGROUND

Tidewater was incorporated in 1995 by Chuck, Robert, and William. It engaged in the business of purchasing timber, hiring loggers to cut the timber, and then reselling the timber to mills. Chuck and Robert operated the corporation, while William had minimal involvement.

Tidewater's initial funding originated from a line of credit obtained from the Bank of Greeleyville and secured by William's personal assets. Chuck and Robert did not contribute any capital to the start-up of Tidewater.

For tax purposes, Chuck, Robert, and William also formed a real estate partnership named CRW through which they purchased timberland. CRW would frequently make improvements to the land that it purchased, and Tidewater provided funding for those improvements. When a payment was made on behalf of CRW by Tidewater, it was recorded in Tidewater's books as an account receivable from CRW.

At some point, Chuck, Robert, and William purchased a tract of land in Orangeburg County (Orangeburg tract), which, according to Chuck, was considered an asset of CRW. The funds to purchase the tract were provided through a mortgage loan from Williamsburg First National Bank. The Williamsburg First National Bank loan was recorded on Tidewater's balance sheet as a long-term liability. According to William, the shareholders also invested a substantial amount of money in improvements to the tract from funds obtained from the Bank of Greeleyville. He estimated that, in total, $700,000 was expended on the Orangeburg tract.

In 2001, Tidewater hired Wanda Poindexter, who has a degree in accounting and decades of bookkeeping and accounting experience, to assist with Tidewater's accounting needs. Although Dana Watford, Tidewater's secretary, was performing the day-to-day bookkeeping for Tidewater, Tidewater wanted Poindexter to check Watford's work and to prepare financial statements, something Watford could not do. Once a quarter, Poindexter would send financial statements that she had prepared for Tidewater to the accounting firm of Burch Oxner Seale for its review. The accounting firm never questioned the reliability of any of the financial statements prepared by Poindexter.

Sometime in late 2001 or early 2002, the Orangeburg tract was put up for sale. It languished on the market for a while, but, in October or November of 2002, an Orangeburg man agreed to purchase it for $700,000.

At around that same time, in November 2002, Robert was approached by Poindexter at a horse race in Kingstree. Poin-

dexter expressed concern about Tidewater's finances. She told Robert that the corporation was in financial distress and that if something was not done, the corporation might have to declare bankruptcy. Robert then called Chuck to discuss the conversation that he had with Poindexter. Chuck assured Robert that everything was fine.

However, about a month later, in late December 2002, Chuck called Robert and William and told them that there was a major problem and that an immediate meeting was needed. At the meeting, Chuck warned Robert and William that the corporation could not pay the bills and that it faced bankruptcy. He also informed them that he was willing to take over the corporation if they wanted out.

Either that night or the day after, the shareholders reached an oral agreement that Tidewater would be dissolved and that Chuck would retain the right to use Tidewater's name in a new venture. The three shareholders also agreed *inter alia* that: (i) Chuck would assume all of Tidewater's liabilities; (ii) Chuck would receive all of Tidewater's assets, with the exception that the accounts receivable from the loggers would be divided equally among the shareholders as collected; [1] and (iii) Chuck would forgive the shareholder debts of Robert and William.

Sometime thereafter, William engaged in a conversation with Scott Williamson, a Senior Vice President at the Bank of Greeleyville, about the dissolution of Tidewater. During this conversation, William discussed what he expected out of the dissolution agreement.

On January 30, 2003, the closing on the Orangeburg tract took place. As a result of the sale, $491,554.45 was disbursed directly from the proceeds to satisfy Williamsburg First National Bank's mortgage on the tract. The remainder was deposited into CRW's checking account. A day after the closing, William wrote a $175,000 check from CRW's checking account to the Bank of Greeleyville to reduce the balance on Tidewater's line of credit. Altogether, Tidewater's liabilities

---

1. Occasionally, Tidewater would advance funds to the loggers to cover their operating costs. Those funds would then be reimbursed at the time of settlement.

were decreased by $666,554.45 ($491,554.45 plus $175,000) as a direct consequence of the sale of the Orangeburg tract.

Poindexter accounted for the $666,554.45 reduction in Tidewater's liabilities by first extinguishing the account receivable from CRW, which she determined was approximately $383,000. She then treated the remaining amount as a contribution from the shareholders, dividing it equally among Chuck, Robert, and William. As a result, the accounts receivable from Robert and William (i.e., their debts to Tidewater) were converted into accounts payable (i.e., liabilities owed by Tidewater to them). Poindexter testified that she treated things this way because of "accounting practice," not because any of the shareholders told her to do so.

Additionally, on February 15, 2003, Poindexter created a financial statement reflecting the corporation's assets and liabilities as of that day. The statement showed an account payable to Robert of $61,252.00 and an account payable to William of $36,909.13. At trial, Poindexter testified that she thought that each of the shareholders received the statement. Poindexter's testimony was corroborated by Robert, who indicated that the shareholders did indeed receive the statement.[2]

On February 28, 2003, Tidewater was dissolved. After the dissolution of Tidewater, CRW remained in business for approximately eight months, dissolving in October 2003.

In July 2006, Robert and William filed a complaint in circuit court seeking an accounting of amounts that they claimed were due to them from Tidewater and Chuck. Tidewater and Chuck subsequently counterclaimed for an accounting of amounts allegedly due to Chuck from Robert and William. The matter was then referred to a special referee.

The special referee ultimately awarded Robert and William each $90,897.35 and found against Appellants on their counterclaim. In calculating the $90,897.35 figure, it appears that the special referee subtracted the account receivable from CRW (which he determined was $393,862.39) from the $666,554.45 reduction in Tidewater's liabilities that resulted from the sale

---

2. Specifically, Robert testified that "once we did the—got the final information there, February 15th of '03, it showed that we had pretty much overpaid some stuff, and—and, you know, that I was due some money from the old company, and my father was also due money from the old company."

of the Orangeburg tract. He then found that the remaining $272,692.06 constituted a contribution by each shareholder of $90,897.35 towards the reduction of Tidewater's debts. Finally, the special referee concluded that Robert and William's contributions to Tidewater resulted in them being substituted for the banks on the debts owed by Tidewater and that, because Chuck assumed the liabilities of Tidewater as of February 28, 2003, Chuck owed Robert and William each $90,897.35.[3]

Tidewater and Chuck subsequently filed a motion to amend the judgment pursuant to Rule 52(b), SCRCP, but it was denied by the special referee after a hearing. This appeal followed.

## ISSUES ON APPEAL

1. Did the special referee err by failing to find that Tidewater's assets were distributed in accordance with the shareholder's dissolution agreement?

2. Alternatively, must the distribution of the Orangeburg proceeds be decided in an accounting of CRW rather than of Tidewater?

3. Did the special referee err by excluding the testimony of Scott Williamson regarding a statement made to him by William about Tidewater's dissolution?

4. Did the special referee err by finding against Tidewater and Chuck with respect to their counterclaim?

5. Does equity require the reversal of the special referee's judgment?

## STANDARD OF REVIEW

■ "An action for an accounting sounds in equity." *Historic Charleston Holdings, LLC v. Mallon*, 381 S.C. 417, 427, 673 S.E.2d 448, 453 (2009). Accordingly, this court may find facts in accordance with its own view of the preponderance of the evidence.[4] *Id.* However, the court "is not required to

---

**3.** Unlike Poindexter, the special referee did not subtract William and Robert's existing debts from their respective contributions.

**4.** "A preponderance of the evidence stated simply is that evidence which convinces as to its truth." *Semken v. Semken*, 379 S.C. 71, 75, 664 S.E.2d 493, 496 (Ct.App.2008).

disregard the factual findings of the referee, who saw and heard the witnesses and was in a better position to judge their credibility." *Godfrey v. Heller*, 311 S.C. 516, 518, 429 S.E.2d 859, 860 (Ct.App.1993).

## LAW/ANALYSIS

### I. Did Chuck Comply with the Shareholders' Dissolution Agreement?

Appellants contend that Chuck complied with the shareholders' dissolution agreement and that Robert and William were therefore precluded from recovering under an accounting cause of action. As explained below, we conclude that Robert and William were entitled to recover under an accounting cause of action, but that the judgment awarded by the special referee must be modified.

The special referee found, and we agree, that the terms of the dissolution agreement were as follows: (i) Chuck would retain the right to use the Tidewater name; (ii) accounts receivable from the loggers would be divided equally among the shareholders as they were collected; (iii) Chuck would assume all other assets of Tidewater; (iv) Chuck would assume all liabilities of Tidewater; (v) Chuck would forgive all of the debts of Robert and William; and (vi) Chuck would release William from his personal obligation to the Bank of Greeleyville on Tidewater's line of credit.

Our inquiry, however, is not yet complete; we must still decide what Tidewater's liabilities were at the time of its dissolution.[5] More specifically, we must determine what, if anything, Tidewater owed Robert and William when it dissolved.

At trial, the following three accountants testified regarding the amounts owed by Tidewater to Robert and William at the time of its dissolution: (i) Poindexter;[6] (ii) Janet Hicks; and

---

**5.** We agree with the special referee's finding that Chuck agreed to assume the liabilities of Tidewater as of February 28, 2003, the date it ceased doing business.

**6.** According to Appellants' reply brief, Poindexter was presented as a fact witness, not an expert witness. Nonetheless, this court may still consider her testimony on the issue of Tidewater's liabilities to Robert

(iii) James King.[7] After carefully reviewing the record, we conclude that Poindexter's analysis, as evidenced by her February 15, 2003 financial statement, best reflects the shareholders' agreement as to those amounts.[8] Poindexter, who was employed as Tidewater's accountant at the time, created the February 15, 2003 statement specifically for the purposes of Tidewater's dissolution. She testified that "knowing that the company was going to close, you have to have a definition between partners. . . . And at this point with Chuck taking over the company, the assets from the company to a new company, I separated them out per partner where each individual one would know exactly what was being done [to] them or they owed, either way." Considering that the shareholders entered into an agreement in which Chuck agreed to assume all of Tidewater's liabilities, it was certainly important to have a document that stated exactly what those liabilities were. Furthermore, there is simply no evidence that any of the shareholders ever asked Poindexter to modify the statement, even though the record indicates that the shareholders received a copy of it shortly before Tidewater's dissolution.

With respect to Hicks' analysis of Tidewater's liabilities to Robert and William, we do not find it to be persuasive. At trial, Hicks introduced Defendant's Exhibit 3, which sets forth Hicks' determination as to the assets and liabilities of Tidewater at the time of its dissolution. Defendant's Exhibit 3, which does not list any liabilities owed to Robert, William, or CRW, shows that Tidewater's assets exceeded its liabilities by $57,036.22. Additionally, Hicks testified that Robert and William were collectively able to walk away from liabilities of

and William. *See Bray v. Head*, 311 S.C. 490, 497–98, 429 S.E.2d 842, 846 (Ct.App.1993) (holding, in an action for dissolution of partnership and division of assets, that partner was not required to offer an analysis of partnership accounts by an expert witness, but rather could rely upon the testimony of the partners' office manager).

7. The trial transcript does not contain the relevant testimony from King. However, as discussed below, the special referee's order indicates that King did provide an opinion as to the amounts owed by Tidewater to Robert and William when it dissolved.

8. Poindexter's February 15, 2003 financial statement is not in the record. However, Poindexter testified to the pertinent portions of its contents.

approximately $120,000 as a result of the dissolution agreement. Hicks therefore concluded that, because Chuck received approximately $60,000 from the dissolution and Robert and William received a benefit worth, on average, $60,000, "no one is due anything and nobody owes anybody anything."

Hicks' approach has two major weaknesses. First, it is premised upon what *Hicks* believes is a fair outcome rather than on any real evidence as to the shareholders' intent. Significantly, Defendant's Exhibit 3 does not take into account intangible assets like the value of Tidewater's name, even though Chuck testified that he "didn't want to start over as far as the name goes" and that he wanted to keep the Tidewater name because "it was an established, reputable name." Second, Hicks failed to present a clear explanation as to how the payments made to Williamsburg First National Bank and the Bank of Greeleyville should have been treated on Tidewater's books. For instance, while she testified at trial that the payments should have resulted in the account receivable from CRW being converted to an account payable, Defendant's Exhibit 3 does not include an account payable to CRW.

Finally, as to King's analysis, which was relied upon by the special referee, we note that the trial transcript contains only two pages of King's testimony and that those two pages do not address the amount of Tidewater's liabilities to Robert and William. Moreover, while the special referee's order summarizes some of King's testimony, it is unclear why King failed to fully accept the approach taken by Poindexter in accounting for the payments made to Williamsburg First National Bank and the Bank of Greeleyville. Although King appeared to agree with Poindexter that the payments resulted in the shareholders each making a contribution to Tidewater, King apparently determined that Robert and William's existing debts to Tidewater should not have been subtracted from their respective contributions. However, we are unable to ascertain why King made this latter determination. It is possible that King concluded that Chuck forgave William and Robert's shareholder debts *before* the proceeds from the Orangeburg tract were disbursed to Williamsburg First National Bank and the Bank of Greeleyville. However, the evidence does not support such a conclusion; in fact, it demonstrates just the opposite. In a deposition, Robert testified that Chuck told

him that *"when we pay this stuff off,"* I'll just wash your debt and your daddy's debt clean." By "when we pay this stuff off," Chuck was apparently referring to using the proceeds from the sale of the Orangeburg tract to reduce Tidewater's debt. Thus, it does not appear that Chuck intended to forgive Robert and William's shareholder debts before Tidewater's debts were reduced by means of the Orangeburg tract proceeds. Furthermore, according to the special referee's order, King testified that the Orangeburg tract sale changed the relationship between Tidewater and the Morrises from that of creditor to debtor. Hence, it appears that King believed that Robert and William owed debts to Tidewater at the time of the Orangeburg tract sale and that the Orangeburg tract proceeds erased those debts. Finally, it must be noted that the special referee expressly found that Chuck agreed to assume the liabilities of Tidewater as of February 28, 2003, and there is no evidence in the record that the various portions of the agreement (i.e., the assumption of Tidewater's liabilities and the extinguishment of Robert and William's debts to Tidewater) were intended to become effective at different times. Accordingly, we conclude that Chuck did not forgive Robert and William's shareholder debts prior to the disbursement of the Orangeburg tract proceeds to Williamsburg First National Bank and the Bank of Greeleyville.

For these reasons, we find that Poindexter's February 15, 2003 financial statement best reflects the amounts owed by Tidewater to Robert and William at the time of its dissolution. *Cf. Bray,* 311 S.C. at 497–98, 429 S.E.2d at 846 (holding, in a partnership accounting action, that the special master properly relied upon the accounting analysis offered by the partners' office manager, rather than the analysis of a certified public accountant, where the office manager's analysis was more consistent with the partners' agreement regarding the accounting treatment to be afforded to a partner's payments on a partnership loan). As noted above, Poindexter's February 15, 2003 statement shows that Tidewater owed liabilities of $61,252.00 and $36,909.13 to Robert and William, respectively. Accordingly, we hold that the special referee's award of $90,897.35 each to Robert and William must be modified to instead award $61,252.00 to Robert and $36,909.13 to William.

## II. Must the Proceeds from the Sale of the Orangeburg Tract be Disbursed in an Accounting of CRW rather than of Tidewater?

■ Alternatively, Appellants contend that, to the extent that the parties intended for Robert and William to have a claim to the proceeds of the Orangeburg tract, the proper distribution of those proceeds should have been decided in an accounting of CRW, rather than of Tidewater.

We are not persuaded by Appellants' argument. The HUD statement for the sale of the Orangeburg tract shows the sellers as being Chuck, Robert, and William in their individual capacities, not the partnership entity of CRW. In fact, in their brief, Appellants state that the Orangeburg tract was titled in the names of Chuck, Robert, and William.[9] Thus, while the shareholders may have considered the Orangeburg tract to be an asset of CRW, it was not legally a CRW asset.

Furthermore, the asset section of the settlement statement for CRW's dissolution does not list an account receivable from Tidewater, even though the $666,554.45 reduction in Tidewater's debts that resulted from the Orangeburg tract sale exceeded the amount then owed by CRW to Tidewater. This telling fact demonstrates that Chuck, Robert, and William, each of whom signed CRW's settlement statement, did not think CRW was owed anything as a result of the way in which the Orangeburg tract proceeds were disbursed.

For these reasons, we conclude that an accounting of CRW was not legally required to properly distribute the Orangeburg tract proceeds.

## III. Did the Special Referee Err by Excluding Scott Williamson's Testimony Regarding William's Statement to Him About the Dissolution of Tidewater?

■ Next, Appellants contend that the special referee erred by excluding, on hearsay grounds, testimony by the Bank of Greeleyville's Scott Williamson that William told him that "his main concern [regarding Tidewater's dissolution] was he got

---

9. Although Chuck testified in a deposition that CRW purchased the Orangeburg tract, the brief submitted by him and Tidewater states that the tract was titled in the names of Chuck, Robert, and William.

his property back off the mortgage, that he was released from any personal liability, [and] that as long as Chuck was going to assume all the liabilities of the company, then he could have the rest of the company as well." Specifically, Appellants argue that this statement was admissible as an admission of a party-opponent under Rule 801(d)(2)(A), SCRE. At trial, the special referee excluded the statement on the ground that it was hearsay as to Robert.

" 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Rule 801(c), SCRE. A statement is not hearsay if the statement is "offered against a party and is (A) the party's own statement in either an individual or a representative capacity." Rule 801(d)(2), SCRE.

In *State v. Anders*, 331 S.C. 474, 503 S.E.2d 443 (1998), the South Carolina Supreme Court addressed whether a defendant's admission was admissible against another defendant under Rule 801(d)(2)(A) where the two defendants were tried in a joint trial. The court concluded that it was not, explaining:

> Rule 801(d)(2) provides a statement is an admission if it is "offered against a party and is (A) the party's own statement in either an individual or a representative capacity . . ." The statement here was not Anders' "own statement," and was clearly therefore not admissible as an admission against Anders.

*Id.* at 478 n. 4, 503 S.E.2d at 445 n. 4 (quoting Rule 801(d)(2), SCRE). Thus, in the present case, William's statement was not admissible against Robert under Rule 801(d)(2)(A) because the statement was not Robert's "own statement."

 Nevertheless, the statement may have been admissible against William. As the South Carolina Supreme Court has explained, "evidence may be admissible against one defendant and inadmissible against another." *Jamison v. Howard*, 275 S.C. 344, 349, 271 S.E.2d 116, 119 (1980).[10] In fact, the

---

10. The court is cognizant of the fact that Robert and William were plaintiffs here, rather than defendants. However, nothing in *Jamison* suggests that the quoted language would be inapplicable to a set of plaintiffs.

supreme court has held that "when a statement is admissible against one defendant and not against others, ... the trial judge must admit the statement against the defendant and instruct the jury to disregard it as to the other defendants." *Player v. Thompson*, 259 S.C. 600, 608, 193 S.E.2d 531, 535 (1972).[11] Thus, in the present case, because the challenged statement was William's "own statement" as contemplated by Rule 801(d)(2)(A), it arguably should have been admitted against him. *Cf. Eberhardt v. Forrester*, 241 S.C. 399, 403–04, 128 S.E.2d 687, 689–90 (1962) (holding, in a civil action against the operator and the owners of a vehicle, that the operator's post-collision statement regarding the vehicle's brakes was admissible against the operator and that the owners were "entitled only to a ruling or instruction thereabout").

■ However, even if the special referee erred in excluding the statement, we conclude that any such error was harmless and therefore does not mandate reversal. *See Fields v. J. Haynes Waters Builders, Inc.*, 376 S.C. 545, 557, 658 S.E.2d 80, 86 (2008) ("[T]o warrant reversal based on the admission or exclusion of evidence, the appealing party must show both the error of the ruling and prejudice.").[12] The statement does not touch upon the critical issue in this case, i.e., whether Tidewater's liabilities at the time of its dissolution included amounts owed to Robert and William. Furthermore, the special referee found that the shareholders agreed that Chuck would assume Tidewater's liabilities and, in return, would have the right to all of its assets, other than the accounts receivable from the loggers, which would be divided equally as collected. The only way in which the statement conflicts with that finding is that it does not mention the division of the accounts

11. The court notes that *Player* was a civil case. In criminal cases, the analysis is generally more complicated because of the Confrontation Clause of the Sixth Amendment. *See, e.g., State v. Page*, 378 S.C. 476, 481, 663 S.E.2d 357, 359 (Ct.App.2008) ("The introduction of a nontestifying co-defendant's statement which implicates a defendant violates a defendant's right to confrontation because no opportunity to cross-examine the co-defendant is presented. Because the right to confrontation is so fundamental, limiting instructions are not an adequate substitute.") (citations omitted).

12. Interestingly, Appellants state in their reply brief that they "do not request that the Court of Appeals reverse on this error alone."

receivable from the loggers. However, the special referee's finding regarding the accounts receivable from the loggers is not at issue in this case.[13] Accordingly, we conclude that Appellants did not suffer any prejudice as a result of the exclusion of this statement.

## IV. Did the Special Referee Err by Finding Against Appellants on their Counterclaim?

Next, Appellants contend that the special referee erred in finding against them with respect to their counterclaim. Specifically, they argue that Robert and William understated the amounts they withdrew from Tidewater. In making this argument, Appellants point to evidence presented by Hicks that purports to show Robert's net withdrawals from the corporation totaled $179,857.83, while William's totaled $175,256.01. Appellants claim that, because Tidewater's December 31, 2002 balance sheet shows a shareholder debt of $22,978.46 for Robert and $47,689.19 for William, Robert understated his debt to Tidewater by $156,879.37 and William understated his debt by $127,566.82. Thus, according to Appellants, Robert and William collectively understated their debts to Tidewater by a total of $284,446.19.

Upon our review of the entire record, we are not persuaded that the special referee erred by finding against Appellants with regard to their counterclaim. At trial, Hicks presented spreadsheets of numerous "questionable checks and deposits" that allegedly demonstrated that Robert and William withdrew net sums of $179,857.83 and $175,256.01, respectively, from Tidewater.[14] However, Hicks did not go through each entry individually and explain why she found it questionable. Moreover, Hicks' testimony at trial was inconsistent with her spreadsheets in that, as noted above, she stated that Robert and William "were allowed to walk away from liabilities that approximate *$120,000 in total.*" According to Hicks' spreadsheets, Robert and William's net withdrawals from Tidewater

---

13. The special referee found that Chuck had paid all sums of money collected from the accounts receivable of the loggers.

14. Interestingly, Hicks also testified that Chuck withdrew $102,817.03 from Tidewater. Tidewater's December 31, 2002 balance sheet, however, indicates that Chuck did not owe any money to Tidewater.

totaled $355,113.84, which is almost three times the $120,000 figure. Additionally, the evidence presented by Hicks conflicted with testimony provided by Robert and William. For instance, Robert testified that, as far as he knew, Tidewater's records accurately reflected the amounts that he owed. Similarly, William testified that he believed that every personal loan that he received from Tidewater was accounted for. Accordingly, we conclude that Appellants have failed to adequately demonstrate that Robert and William collectively understated their debts to Tidewater by a sum of $284,446.19.

Furthermore, under the terms of the dissolution agreement, Chuck agreed to forgive Robert and William's debts to Tidewater.[15] Moreover, Chuck, who was Tidewater's president and who kept up with Tidewater's books, testified that he was aware that unrecorded withdrawals were being taken by the Tidewater shareholders, as evidenced by the following exchange between him and his attorney:

Q: What about loans from the company and that sort of thing?

A: We—they—they were taken.

Q: Explain what you mean when you say they were taken.

A: Basically, we didn't operate the company the way a company should be operated. It—there were personal loans taken over the whole span that we were [sic] business....

Q: When—when you all would take a loan, would it get booked—would it get written up in the company records?

A: No.

Q: Did it sometimes get written in the ...?

A: Sometimes.

Thus, assuming *arguendo* that Robert and William did make some unrecorded withdrawals from Tidewater, it appears that Chuck agreed to forgive those amounts as part of the dissolution agreement.[16]

---

15. Indeed, it appears that it was Chuck, rather than Robert or William, who proposed that he forgive the Morrises' shareholder debts.

16. In their reply brief, Appellants contend that Chuck did not know the full extent of Robert and William's unrecorded withdrawals. However,

For these reasons, we conclude that reversal of the special referee's ruling on this issue is not warranted.

## V. Does Equity Require Reversal of the Special Referee's Judgment?

■ Finally, Appellants contend that equity requires leaving the parties in the position they were in before the commencement of the accounting action. We disagree.

■ "Equity will allow a party to recover on an enforceable, legal contract as long as the right to be vindicated arises under that contract and not under an independent illegal agreement." *Cherry v. Thomasson,* 276 S.C. 524, 527, 280 S.E.2d 541, 542 (1981). In the context of an accounting action, this court has specifically held that "[h]ardship alone provides no basis for relieving one from a contract." *Gamble, Givens & Moody v. Moise,* 288 S.C. 210, 218, 341 S.E.2d 147, 151 (Ct.App.1986).

Here, we have concluded that, under the terms of the shareholders' dissolution agreement, Robert was entitled to $61,252.00 and William was entitled to $36,909.13. Appellants have not contended that the dissolution agreement was illegal or otherwise unenforceable.[17] Accordingly, we find that Robert and William must be awarded the amounts they are entitled to under the dissolution agreement.

### Conclusion

For the foregoing reasons, we find that the special referee's award of $90,897.35 each to Robert and William must be modified to instead award $61,252.00 to Robert and $36,909.13 to William.

**AFFIRMED AS MODIFIED.**

PIEPER, J., and CURETON, A.J., concur.

---

Appellants' argument is not supported by any citation to the record. Under our appellate court rules, we may not consider any fact that does not appear in the record. *See* Rule 210(h), SCACR.

17. In fact, as noted above, one of Appellants' arguments on appeal is that Respondents cannot recover under an accounting cause of action because Chuck distributed Tidewater's assets in accordance with the dissolution agreement. Thus, Appellants appear to view the dissolution agreement as an enforceable contract.