699 S.E.2d 169

Sonya L. WATSON, Stacy Watson, Curtis L. Watson, and Shirley Watson Individually and as Parents of Sonya L. Watson, Stacy Watson, and Thelma Watson, Plaintiffs,

v.

FORD MOTOR COMPANY, TRW, Inc., TRW Vehicle Safety Systems, Inc., and D&D Motors, Inc., Defendants.

Willie E. Carter, as Personal Representative of the Estate of Patricia Ann S. Carter, Deceased, Plaintiffs,

v.

Ford Motor Company, TRW, Inc., TRW Vehicle Safety Systems, Inc., and D&D Motors, Inc., Defendants,

of whom Sonya L. Watson, Stacy Watson, Curtis L. Watson and Shirley Watson, Individually and as Parents of Sonya L. Watson, Stacy Watson, and Thelma Watson, and Willie E. Carter, as Personal Representative of the Estate of Patricia Ann S. Carter, Deceased, are the Respondents,

and

Ford Motor Company is the Appellant.

No. 26786.

Supreme Court of South Carolina.

Heard Feb. 5, 2009.

Decided Sept. 13, 2010.

Rehearing Denied Oct. 6, 2010.

438

C. Mitchell Brown, William C. Wood, Jr., Elizabeth H. Campbell and A. Mattison Bogan, all of Nelson Mullins Riley & Scarborough, Elbert S. Dorn, and Nicholas W. Gladd, both of Turner, Padget, Graham & Laney, all of Columbia, for Appellant.

James Edward Bell III, of Georgetown, James Walter Fayssoux, Jr., of Greenville, and Kevin R. Dean, of Motley Rice, of Mt. Pleasant, for Respondents.

Chief Justice TOAL.

Following a single vehicle accident, Respondents Sonya L. Watson and the Estate of Patricia Carter filed a products liability suit against Appellants. A jury found against Appellant Ford Motor Company ("Ford") and awarded Respondents $18 million in compensatory damages. On appeal, Ford argues that the trial court erred in several respects. After issuing an initial opinion, Respondents and Ford presented this Court with Motions to Clarify. Additionally, Respondents submitted a Petition for Rehearing. We now grant the Motions to Clarify, deny Respondent's Petition for Rehearing, and substitute this opinion in place of the original opinion.

### FACTUAL/PROCEDURAL BACKGROUND

On December 11, 1999, Watson was driving a 1995 Ford Explorer along with three other passengers including Patricia Carter. Shortly after entering Interstate 385, Watson lost control of the vehicle, which then veered off the left side of the interstate and rolled four times. Watson and Carter were ejected from the vehicle. Watson suffered severe injuries that rendered her quadriplegic; Carter died in the accident. Respondents filed a products liability suit against Ford, D&D Motors, Inc., and TRW Vehicle Safety Systems, Inc. alleging

that the cruise control system and the seatbelts were defective and seeking actual and punitive damages.

At trial, Watson testified that when she entered the interstate, she promptly set the cruise control, but shortly thereafter, the Explorer began to suddenly accelerate. Watson testified that she reached down in an attempt to grasp the gas pedal, but was stopped by her seat belt and that she then pumped her brakes to no avail before crashing. Watson's father testified that on two occasions prior to the accident, the Explorer suddenly accelerated while he was driving. As a result, he took the vehicle into D&D Motors, and the technicians determined that the new floor mats were upside-down and needed to be turned over.[1]

Respondents' theory of the case was that the Explorer's cruise control system was defective because it allowed electromagnetic interference (EMI) to affect the system. EMI is an unwanted disturbance caused by electromagnetic radiation that interferes with an electric circuit. To support this theory, Respondents presented Dr. Antony Anderson, an electrical engineer from Britain. Dr. Anderson testified as to his theory that EMI can interfere with the speed control component of a cruise control system and cause a vehicle to suddenly and uncontrollably accelerate. He concluded that on the day of the accident, EMI interfered with the Explorer's cruise control system, which caused it to suddenly accelerate and resulted in the accident. Dr. Anderson further opined that Ford could have employed a feasible alternative design to prevent EMI. Specifically, he testified that Ford could have used "twisted pair wiring" in order to prevent EMI from passing between the wires and had Ford used the twisted pair wiring, the accident would not have occurred.

In addition to Dr. Anderson's testimony, Respondents presented testimony from Bill Williams who was qualified as an expert on "cruise control diagnosis" as well as evidence from four witnesses who testified as to other similar incidents in

---

1. A service invoice sheet included in the record confirms that Mr. Watson brought the Explorer into D&D Motors to "[check] gas pedal for sticking," but that D&D Motors determined that the pedal would "stick into floor mat" when it was pushed hard and the "customer needs to turn floor mats back over."

which their Explorers suddenly accelerated without the driver's input.

Ford argued that Dr. Anderson's EMI theory was unreliable and lacked any scientific foundation, and to counter the theory, Ford presented their cruise control expert, Karl Passeger. Passeger testified that EMI signals have no effect on a cruise control system and that the system contains a watchdog feature that automatically checks for improper signals and resets the cruise control computer if it is not operating correctly. Additionally, Ford suggested that the floor mats could have caused the sudden acceleration as they had on previous occasions.

The trial court issued a lengthy jury charge on the law of products liability. During deliberations, the jury submitted a question to the trial court asking, "Can we consider other causes of cruise control malfunction other than EMI?" The trial court responded, "You may consider any and all evidence which was properly admitted at trial and give it the weight that you think it deserves." The jury found Ford liable on the cruise control products liability claim, but found against Respondents on their defective seat belt claim and on their claim for punitive damages. The jury awarded compensatory damages of $15 million to Watson and $3 million to the Estate of Patricia Carter.

The trial court entered judgment on the jury's verdict. Ford filed post-trial motions, including a motion for judgment notwithstanding the verdict. The trial court denied Ford's motions.

We certified this case pursuant to Rule 204(b), SCACR, and Ford presents the following issues on appeal: [2]

I. Did the trial court err in qualifying Bill Williams as an expert in cruise control systems?

---

2. Although Ford presented several other issues on appeal, we find that these four issues are dispositive to the outcome. Therefore, we decline to address the remaining issues. *See Futch v. McAllister Towing of Georgetown, Inc.,* 335 S.C. 598, 613, 518 S.E.2d 591, 598 (1999) (holding that the Court need not rule on remaining issues when the disposition of prior issues is dispositive).

II. Did the trial court err in allowing Dr. Anderson's expert testimony regarding EMI and alternative feasible design?

III. Did the trial court err in allowing evidence of other incidents of sudden acceleration in Explorers?

IV. Did the trial court err in denying Appellant's motion for judgment notwithstanding the verdict?

## STANDARD OF REVIEW

In an action at law, on appeal of a case tried by a jury, this Court may only correct of errors of law. *Townes Associates, Ltd. v. City of Greenville*, 266 S.C. 81, 85, 221 S.E.2d 773, 775 (1976). The factual findings of the jury will not be disturbed unless no evidence reasonably supports the jury's findings. *Id.*

## LAW/ANALYSIS

This is a products liability case in which Respondents allege Appellant produced a defective vehicle. For the sake of context, there are three defects a plaintiff in a products liability lawsuit can allege: 1) a manufacturing defect, 2) a warning defect, and 3) a design defect. When a manufacturing defect claim is made, a plaintiff alleges that a particular product was defectively manufactured. When a warning defect claim is made, a plaintiff alleges that he was not adequately warned of dangers inherent to a product. When a design defect claim is made, a plaintiff alleges that the product at issue was defectively designed, thus causing an entire line of products to be unreasonably dangerous.

In this case, Respondents pursued a design defect claim against Appellant. Such claims necessarily involve sophisticated issues of engineering, technical science, and other complex concepts that are quintessentially beyond the ken of a lay person. In discussing the issue of proof in a defective design case, Professors Hubbard and Felix say, "As with other matters in varying degrees beyond the knowledge and experience of ordinary persons, expert testimony will often be useful and may be necessary." F. PATRICK HUBBARD & ROBERT L. FELIX, THE SOUTH CAROLINA LAW OF TORTS 313 (3d ed.2004). In most design defect cases, plaintiffs offer expert testimony as

evidence to establish their claim. Often design defect claims are also supported by evidence of similar incidents used to bolster plaintiff's design defect allegations. Given the complexity of the allegations involved in this case, Respondents relied on expert testimony to explain their claims and buttressed this testimony with evidence of what were claimed to be similar incidents. It is with this context in mind that we analyze the issues presented.

## I. Expert Testimony

 The jury and the trial court each have distinct roles and separate responsibilities that they must execute during a trial. The jury serves as the fact finder and is charged with the duty of weighing the evidence admitted at trial and reaching a verdict. The trial court, on the other hand, is charged with the duty of determining issues of law. As a part of this duty, the trial court serves as the gatekeeper and must decide whether the evidence submitted by a party is admissible pursuant to the Rules of Evidence as a matter of law. Once the trial court makes a ruling that the particular evidence is admissible, then it is exclusively within the jury's province to decide how much weight the evidence deserves. Importantly, the trial court is never permitted to second-guess the jury in their fact finding responsibilities unless compelling reasons justify invading the jury's province. *See Bailey v. Peacock,* 318 S.C. 13, 14, 455 S.E.2d 690, 692 (1995).

The admission of expert testimony is governed by Rule 702, SCRE, which provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

 Expert testimony may be used to help the jury to determine a fact in issue based on the expert's specialized knowledge, experience, or skill and is necessary in cases in which the subject matter falls outside the realm of ordinary lay knowledge. Stated differently, expert evidence is required where a factual issue must be resolved with scientific, technical, or any other specialized knowledge. Expert testimony

differs from lay testimony in that an expert witness is permitted to state an opinion based on facts not within his firsthand knowledge or may base his opinion on information made available before the hearing so long as it is the type of information that is reasonably relied upon in the field to make opinions. *See* Rule 703, SCRE. On the other hand, a lay witness may only testify as to matters within his personal knowledge and may not offer opinion testimony which requires special knowledge, skill, experience, or training. *See* Rules 602 and 701, SCRE.

For these reasons, expert testimony receives additional scrutiny relative to other evidentiary decisions. Specifically, in executing its gatekeeping duties, the trial court must make three key preliminary findings which are fundamental to Rule 702 before the jury may consider expert testimony. First, the trial court must find that the subject matter is beyond the ordinary knowledge of the jury, thus requiring an expert to explain the matter to the jury. *See State v. Douglas,* 380 S.C. 499, 671 S.E.2d 606 (2009) (holding that the witness was improperly qualified as a forensic interviewing expert where the nature of her testimony was based on personal observations and discussions with the child victim). Next, while the expert need not be a specialist in the particular branch of the field, the trial court must find that the proffered expert has indeed acquired the requisite knowledge and skill to qualify as an expert in the particular subject matter. *See Gooding v. St. Francis Xavier Hosp.,* 326 S.C. 248, 252–53, 487 S.E.2d 596, 598 (1997) (observing that to be competent to testify as an expert, a witness must have acquired by reason of study or experience such knowledge and skill in a profession or science that he is better qualified than the jury to form an opinion on the particular subject of his testimony). Finally, the trial court must evaluate the substance of the testimony and determine whether it is reliable. *See State v. Council,* 335 S.C. 1, 20, 515 S.E.2d 508, 518 (evaluating whether expert testimony on DNA analysis met the reliability requirements).

Expert testimony is not admissible unless it satisfies all three requirements with respect to subject matter, expert qualifications, and reliability. Thus, only after the trial court has found that expert testimony is necessary to assist the jury in resolving factual questions, the expert is qualified in the

particular area, and the testimony is reliable, may the trial court admit the evidence and permit the jury to assign it such weight as it deems appropriate. *See State v. White*, 382 S.C. 265, 676 S.E.2d 684 (2009) (observing that the "familiar evidentiary mantra that a challenge to evidence goes to 'weight, not admissibility' may be invoked only after the trial court has vetted the matters of qualifications and reliability and admitted the evidence"). It is against this backdrop that we analyze whether the trial court erred in admitting the challenged expert evidence.

## A. Bill Williams' Testimony

■ Ford argues that the trial court erred in qualifying Bill Williams as an expert on cruise control diagnosis. We agree.

■ A person may be qualified as an expert in a particular area based upon knowledge, skill, experience, training or education. Rule 702, SCRE. In determining a witness's qualifications as an expert, the trial court should not have a solitary focus, but rather, should make an inquiry broad in scope. *Fields v. J. Haynes Waters Builders, Inc.*, 376 S.C. 545, 555, 658 S.E.2d 80, 85 (2008). The test for qualification of an expert is a relative one that is dependent on the particular witness's reference to the subject. *Wilson v. Rivers*, 357 S.C. 447, 452, 593 S.E.2d 603, 605 (2004). The qualification of a witness as an expert is within the trial court's discretion, and this Court will not reverse that decision absent an abuse of discretion. *Fields*, 376 at 555, 658 S.E.2d at 85.

During the motion *in limine* to determine whether Williams qualified as a cruise control expert, Williams testified that he had worked in the automotive industry as a trainer, consultant, software developer, and writer since the early 1980s and was currently conducting seminars to train automobile technicians who focus on the brake systems in vehicles. On cross-examination, Williams admitted that he had no professional experience working on cruise control systems prior to this litigation. He also admitted that he had not conducted any comparison of the Explorer's cruise control system to any other system and acknowledged that he had never taught or published papers on cruise control systems. The trial court

ruled that Williams qualified as an expert in "the training and operation of the cruise control and brakes" and allowed him to testify as to "cruise control diagnosis."

In our view, there is no evidence to support the trial court's qualification of Williams as an expert in cruise control systems. Williams had no knowledge, skill, experience, training or education specifically related to cruise control systems. Rather, it appears he merely studied the Explorer's system just before trial, which he indicated in his testimony to the jury: "This is how I taught myself the [Explorer's] cruise control, or speed control system." While Williams may have been qualified as an expert in other aspects of automobile components, such as the brake system, the trial court failed to properly evaluate Williams' qualifications specific to cruise control systems. *Compare Wilson,* 357 S.C. at 452, 593 S.E.2d at 605 (holding that the trial court erred in refusing to qualify a medical doctor as an expert in biomechanics where the doctor had training in biomechanics, had been qualified as a biomechanics expert in other states, and had some educational background in biomechanics); *Lee v. Suess,* 318 S.C. 283, 457 S.E.2d 344 (1995) (holding that the trial court erred in failing to qualify a plastic surgeon as an expert in the field of family practice where the plastic surgeon served as a professor who provided instruction to family practitioner residents and where family practitioners referred their patients to him for diagnosis). Accordingly, we hold that the trial court erred in qualifying Williams as a cruise control expert.

Notwithstanding this error, to warrant reversal, Ford must show that it was prejudiced by the admission of this evidence. *See Fields,* 376 S.C. at 557, 658 S.E.2d at 86. Prejudice is a reasonable probability that the jury's verdict was influenced by the challenged evidence. *Id.* (finding that the trial court's error in failing to qualify an expert was harmless error since the testimony would have been cumulative).

In this case, we do not believe that this error alone prejudiced Ford's defense. Williams' testimony essentially consisted of a description of the system accompanied by models and diagrams of the components. Moreover, the jury heard Ford extensively question Williams' qualifications on cross-examination regarding his knowledge of cruise control systems in an

attempt to impeach his credibility on the subject. Furthermore, the trial court prohibited Williams from testifying to matters outside of his scope, specifically noting he could not testify as to electrical engineering matters.

■ Trial courts should be cautious in conferring an expert label upon a witness because juries may accord excessive or undue weight to "expert" testimony. In this case, however, we hold that the trial court's error in qualifying Williams as an expert in cruise control diagnosis did not prejudice Ford.

### B. Dr. Anderson's Testimony

■ Ford argues that the trial court abused its discretion in admitting Dr. Anderson's expert testimony. Specifically, Ford claims that Dr. Anderson was not qualified to testify as to alternative designs and his theory regarding EMI as the cause of the sudden acceleration failed to meet the reliability requirements. We agree.

■ As a primary matter, we reject Respondents' argument that because Dr. Anderson presented technical evidence, as opposed to scientific evidence, his testimony did not have to meet the reliability requirements. The trial court must examine the substance of the testimony to determine if it is reliable, regardless of whether the expert evidence is scientific, technical, or other specialized knowledge. *See White,* 382 S.C. at 270, 676 S.E.2d at 686 (holding that all expert evidence must satisfy Rule 702, both in terms of expert qualifications and reliability of the subject matter); *see also Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) (holding that in determining the admissibility of evidence pursuant to Rule 702, FRE, the same reliability requirements apply to all types of expert evidence).

Turning to the merits of Ford's argument, in order for Dr. Anderson's expert testimony to be admissible, the trial court had to find not only that Dr. Anderson was an expert based on his knowledge, skill, experience, training, or education in the field of EMI and its affect on automobiles, but also that the substance of his testimony was reliable. With regard to the reliability requirement, in *Council,* this Court listed several

factors that the trial court should consider when determining whether scientific expert evidence is reliable:[3]

(1) the publications and peer review of the technique; (2) prior application of the method to the type of evidence involved in the case; (3) the quality control procedures used to ensure reliability; and (4) the consistency of the method with recognized scientific laws and procedures.

*Id.* at 19, 515 S.E.2d at 517 (citing *State v. Ford,* 301 S.C. 485, 392 S.E.2d 781 (1990)).

We find that the trial court erred in admitting Dr. Anderson's testimony as to both an alternative feasible design and his EMI theory.[4] With regard to alternative feasible design, Dr. Anderson failed to meet Rule 702's fundamental requirement that the witness be qualified in the particular area of expertise. Dr. Anderson's background involved working with massive generators which have entirely different electrical wiring systems and different voltage levels. He had no experience in the automobile industry, never studied a cruise control system, and never designed any component of a cruise control system. Moreover, Respondents failed to show that the substance of his testimony that twisted pair wiring would have cured the EMI defect was reliable. Dr. Anderson declared that the twisted pair wiring would have prevented EMI but did not explain how twisted pair wiring could be incorporated in to a cruise control system and did not offer any model comparison. Furthermore, Dr. Anderson concluded that this design was economically feasible, but offered no

---

**3.** The test for reliability for expert testimony does not lend itself to a one-size-fits-all approach. *See White,* 382 S.C. at 274, 676 S.E.2d at 688 (holding that the *Council* factors provided no useful analytical framework to evaluate the reliability of expert dog tracking evidence). However, in this case, Dr. Anderson's testimony was based on scientific principles and theories, and therefore, the *Council* factors are applicable and relevant to the reliability determination in this case.

**4.** In *Branham v. Ford Motor Co.,* —— S.C. ——, —— S.E.2d —— (2010) (Shearouse Adv. Sh. No. 32 at 52), this Court adopted the Restatement 3rd approach, which uses the risk-utility test for a design defect claim. Under the risk utility test, a plaintiff must prove an alternative feasible design. Dr. Anderson's testimony was, in part, an attempt to prove Watson's claim using a risk-utility analysis by showing an alternative feasible design. Dr. Anderson's attempt failed for the reasons fully discussed above.

evidence to support this conclusion. Thus, his testimony on this matter lacked any scientific basis and contained no indicia of reliability. Accordingly, we hold that the trial court erred in admitting this testimony because Dr. Anderson was not qualified to testify as to alternative designs to the Explorer's cruise control system and his testimony was not reliable.

Turning to the testimony regarding EMI and its effect on the cruise control system, initially we question whether Dr. Anderson was qualified as an expert on this subject. Again, Dr. Anderson had no experience with automobiles and specifically no experience with cruise control systems. In fact, Dr. Anderson had not even operated an automobile with a cruise control system before this litigation. Nonetheless, assuming Dr. Anderson was properly qualified as an expert in this area, we find that his testimony was not reliable. Dr. Anderson first learned of sudden acceleration occurring in automobiles in 2000 after he was contacted by a television news station that was investigating automobile accidents. Dr. Anderson admitted that his theory had not been peer reviewed, he had never published papers on his theory, and he had never tested his theory. He also admitted that he would not be able to determine exactly where the EMI which he opined caused the cruise control to malfunction originated or what part of the system it affected. He further testified that it would not be possible to replicate the alleged EMI malfunction of a cruise control system in a testing environment. To support his theory that EMI caused the Explorer to suddenly accelerate, Dr. Anderson pointed to only one document, a 1975 National Highway Safety Transportation Administration (NHSTA) report concluding that EMI can cause a cruise control system to malfunction. However, the NHTSA issued superseding report in 1989, which specifically rejected the EMI theory.

▋ In our view, there is no evidence indicating that Dr. Anderson's testimony contained any indicia of reliability. He had never published articles on his theory nor had he tested his theory. Importantly, Dr. Anderson admitted that it was not possible to test for EMI. Furthermore, although it is not a prerequisite in South Carolina that scientific evidence attain general acceptance in the scientific community before it is admitted, we find it instructive that not only has the underlying science not been generally accepted, Dr. Anderson's theo-

ry was rejected in the scientific community. *See Council,* 335 S.C. at 21, 515 S.E.2d at 518 (recognizing and taking in to consideration the fact that the science underlying DNA analysis evidence has been generally accepted in the scientific community in determining whether such evidence was reliable). Therefore, because there is no evidence in the record to show that the substance of Dr. Anderson's testimony was reliable, we hold that the trial court erred in admitting this testimony.[5]

In our view, the trial court's error in admitting Dr. Anderson's testimony is largely based on solely focusing on whether he was qualified as an expert in the field of electrical engineering and failing to analyze the reliability of the proposed testimony.[6] Respondents did not offer Dr. Anderson to testify generally as to the electrical wiring of a circuit system in an automobile. Rather, Respondents sought to introduce Dr. Anderson's testimony to determine a fact in issue based on a scientific hypothesis. The trial court was thus required to examine the substance of the testimony for reliability, and in failing to make this threshold determination, the trial court erred as a matter of law in admitting Dr. Anderson's testimony.

We find that Ford was prejudiced by the admission of this testimony. The only evidence Respondents presented to support their theory that the vehicle was defective was Dr. Anderson's testimony. We also note that Respondents may not rely solely on the fact that an accident occurred to prove

---

5. Several courts have excluded expert testimony regarding theory that EMI may cause a cruise control system to malfunction. *See Federico v. Ford Motor Co.,* 67 Mass.App.Ct. 454, 854 N.E.2d 448 (2006) (upholding the trial court's decision to exclude testimony that EMI would cause malfunction); *Turker v. Ford Motor Co.,* 2007 WL 701046 (Ohio App. 2007) (affirming the trial court's decision that expert testimony on EMI was unreliable); *Jarvis v. Ford Motor Co.,* 1999 WL 461813 (S.D.N.Y. 1999) (excluding the portion of the expert's testimony regarding EMI); *Baker v. Mercedes Benz of North America,* 163 F.3d 1356 (1998) (finding the trial court did not abuse its discretion in finding that plaintiff's expert testimony regarding EMI should be excluded).

6. This is evident from the trial court's ruling: "[Dr. Anderson] does have [requisite] education, knowledge, experience, and would be of scientific help to the jury in this case ... but he's going to be qualified as an expert in the field of electrical engineering."

their products liability case under a negligence theory since South Carolina does not follow the doctrine of *res ipsa loquitur.*[7] *See Snow v. City of Columbia,* 305 S.C. 544, n. 7, 409 S.E.2d 797, n. 7 (Ct.App.1991) (noting that South Carolina does not recognize the rule *of res ipsa loquitur* ). Thus, in the absence of any admissible evidence in the record to support their products liability claim, the jury impermissibly speculated as to the cause of the accident.

## II. Evidence of Other Incidents

Ford argues that the trial court erred in admitting evidence of similar incidents involving sudden acceleration in Explorers. We agree.

▮ Evidence of similar accidents, transactions, or happenings is admissible in South Carolina where there is some special relation between the accidents tending to prove or disprove some fact in dispute. *Whaley v. CSX Transp., Inc.,* 362 S.C. 456, 483, 609 S.E.2d 286, 300 (2005). This rule is based on relevancy, logic, and common sense. *Id.* A plaintiff must present a factual foundation for the court to determine that the other accidents were substantially similar to the accident at issue. *Id.* In *Buckman v. Bombardier Corp.,* the District Court set forth factors that a court should consider when admitting evidence of other incidents to support a claim that the present accident was caused by the same defect: (1) the products are similar; (2) the alleged defect is similar; (3) causation related to the defect in the other incidents; and (4) exclusion of all reasonable secondary explanations for the cause of the other incidents. 893 F.Supp. 547, 552 (E.D.N.C. 1995) (citing *Hale v. Firestone Tire & Rubber Co.,* 756 F.2d 1322, 1332 (8th Cir.1985)).

▮ Respondents introduced the deposition testimony from a separate case of a former Ford employee who investigated a number of claims of unintended acceleration of Explorers driven in Britain. The former employee read from an email where he referenced "35 incidents that have been categorized as unexplainable" in which the vehicles suddenly accel-

---

7. *Res ipsa loquitur* is a rebuttable presumption that the defendant was negligent where an accident is one which ordinarily does not occur in the absence of negligence.

erated. Additionally, Respondents presented three witnesses, one of whom testified by video deposition, who recalled incidents in which their Explorers suddenly accelerated and their cruise control would not disengage.

In our view, Respondents failed to show that the incidents were substantially similar and failed to establish a special relation between the other incidents and Respondents' accident. First, the products were not similar because most of the other incidents involved Explorers that were made in different years from the Watson Explorer and were completely different models with the driver's seat located on the right side of the vehicle. More importantly, Respondents failed to show a similarity of causation between the malfunction in this case and the malfunction in the other incidents and failed to exclude reasonable explanations for the cause of the other incidents. Respondents only presented the testimony of the other drivers and did not present any expert evidence to show that EMI was a factor in the malfunction in the other incidents. Accordingly, this evidence was not relevant because Respondents failed to show that evidence of these incidents made the existence of the EMI defect in this case more probable. *See* Rule 401, SCRE (defining "relevant evidence" as evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence); *see also Whaley,* 362 S.C. at 483–84, 609 S.E.2d at 300 (holding that evidence of other employee complaints and injuries should not have been admitted because the plaintiff failed to show that the injuries stemmed from the same or similar circumstances as the plaintiff's injuries).

Furthermore, we find that this evidence was highly prejudicial. Courts require a plaintiff to establish a factual foundation to show substantial similarity because evidence of similar incidents may be extremely prejudicial. *See id.* at 483, 609 S.E.2d at 300 (recognizing that evidence of other accidents may be highly prejudicial). Respondents' counsel highlighted this improper evidence in closing arguments and thereby possibly induced the jury to speculate as to other causes of the accident not supported by any evidence. For these reasons, we hold that trial court erred in admitting this evidence.

## III. JNOV

Ford argues the trial court erred in denying its motion for judgment notwithstanding the verdict. We agree.

■ "When we review a trial judge's grant or denial of a motion for directed verdict or JNOV, we reverse only when there is no evidence to support the ruling or when the ruling is governed by an error of law." *Austin v. Stokes–Craven*, 387 S.C. 22, 691 S.E.2d 135, 145 (2010) (citing *Creech v. South Carolina Wildlife & Marine Res. Dep't*, 328 S.C. 24, 29, 491 S.E.2d 571, 573 (1997)).

■ We find the evidence submitted at trial was insufficient to support a verdict for Respondents and the evidence shows that Ford is entitled to a judgment as a matter of law. Even if the trial court did not err in qualifying Williams as a cruise control expert, in admitting Dr. Anderson's testimony, and in admitting evidence of similar incidents, the only reasonable inference that could have been drawn from the evidence presented at trial is that Respondents failed to establish, as a matter of law, that EMI caused an unintended acceleration which resulted in Respondents' accident and resulting injuries. Nonetheless, as even the dissent concedes, neither of Respondents' experts presented admissible testimony. Without such testimony, Respondents failed to present a case for products liability.[8] Therefore, Respondents did not present admissible evidence that the cruise control system of the vehicle at issue was defective or unreasonably dangerous.

■ Furthermore, the only reasonable inference that can be drawn from the evidence presented at trial is that Respondents failed, as a matter of law, to prove an alternative feasible design with respect to the vehicle's cruise control system. We find that, because the mere occurrence of an accident or existence of an alleged product malfunction does not establish the liability of a product manufacturer, the trial court erred by failing to enter a judgment in favor of Ford. Therefore, we reverse and enter a judgment in Ford's favor.

---

8. Additionally, none of Respondents' evidence concerning similar incidents was admissible; thus, given the evidence presented at trial, liability could not have been found on any theory.

## CONCLUSION

The trial court serves as the gatekeeper in the admission of all evidence presented at trial, and in making admissibility determinations, the trial court is required to make certain preliminary findings regarding admissibility requirements, such as qualification of experts, reliability of the substance of the testimony, and substantial similarity of alleged similar incidents, before a jury may hear the evidence. If these preliminary requirements are not met, as a matter of law, the trial court may not permit the jury to consider the evidence. In this case, we hold that those threshold admissibility requirements were not met, and therefore, the trial court erred in qualifying Williams as a cruise control expert, in admitting Dr. Anderson's testimony, and in admitting evidence of similar incidents. Finally, we find the evidence submitted at trial was insufficient to support a verdict for Respondents and the evidence shows that Ford is entitled to a judgment as a matter of law. Accordingly, we must reverse the jury's verdict against Ford and enter judgment in its favor.

WALLER, BEATTY and KITTREDGE, JJ., concur.

PLEICONES, J., concurring in part and dissenting in part in a separate opinion.

Justice PLEICONES.

I concur in part and dissent in part. I do not agree with the majority's analysis of the expert witness issue involving Dr. Anderson, or its analysis of the admissibility of the evidence of other acceleration incidents. I nonetheless agree that Dr. Anderson should not have been qualified, and that the evidence of other incidents should not have been admitted. I respectfully dissent from that part of the majority opinion which holds that appellant was entitled to a judgment notwithstanding the verdict (JNOV).

First, the majority posits the trial judge's gatekeeper role with respect to expert testimony as consisting of these three parts:

1. Is the subject matter of the testimony beyond the knowledge of a lay person, thus requiring an expert to explain it?

2. Is the particular witness qualified as an expert in this field?

3. After evaluating the witness' testimony, is it reliable?

As explained below, I disagree with this framework when the subject of the expert testimony is scientific.[9]

I fundamentally disagree with the majority that the first gatekeeper function under Rule 702 is a determination whether the subject matter is beyond a lay person's knowledge and thus requires an expert to explain it. It is certainly true that some types of issues or evidence are *ipso facto* beyond the ken of a lay jury, and always require that the claim be supported by expert testimony. Classically, this is so where the issue is one of medical malpractice. *E.g. Linog v. Yampolsky,* 376 S.C. 182, 656 S.E.2d 355 (2008). There are myriad other areas, however, where both lay and expert testimony may be presented. *See, e.g., State v. Pittman,* 373 S.C. 527, 647 S.E.2d 144 (2007) (sanity); *Hall v. Desert Aire, Inc.,* 376 S.C. 338, 656 S.E.2d 753 (Ct.App.2007) (intoxication); *Small v. Pioneer Machinery, Inc.,* 329 S.C. 448, 494 S.E.2d 835 (Ct. App.1997) (cause of throttle sticking). I therefore disagree with the majority to the extent it now holds that expert testimony is admissible only when it is "required" or "necessary" for the jury to understand evidence or an issue. *See* Rule 702 (expert witness may be called if testimony would assist the jury).

In my view, the proper gatekeeper role under Rule 702, SCRE, is that described in *State v. Council,* 335 S.C. 1, 515 S.E.2d 508 (1999):

1. Is the underlying science reliable?

2. Is the expert witness qualified?; and

3. Would the evidence assist the trier of fact to understand the evidence or to determine a fact in issue?

Here, the underlying science involving the impact of electromagnetic interference (EMI) on electrical systems is reliable, and Dr. Anderson is qualified as an expert on that subject. I would hold, however, that his testimony fails the third prong of the *Council* test. In my view, Dr. Anderson's testimony did

---

**9.** *See State v. White,* 382 S.C. 265, 676 S.E.2d 684 (2009) (scientific reliability factors not applicable to non-scientific experts).

not assist the jury since he was unable to support his opinion that EMI was a probable cause of cruise control acceleration other than by reference to his own opinion. *Cf. Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997) (court not required to admit opinion evidence connected to event only by the expert's *ipse dixit* ); *see also Wilson v. Rivers*, 357 S.C. 447, 593 S.E.2d 603 (2004) n.5 (while witness was expert in field, question whether that science is "reliable" to determine this accident caused the plaintiff's injuries remained unaddressed by trial court).

I agree with the majority that the trial judge erred in exercising his gatekeeper function and permitting Dr. Anderson to testify since Dr. Anderson was unable to link EMI to the sudden acceleration, other than by reference to his own opinion. *Wilson, supra; Joiner, supra.* I do not agree, however, with the majority's view that only an electrical engineer who was also an expert in automobile and/or cruise control systems would be competent to testify, or with its characterization of Dr. Anderson's testimony as lacking "reliability." I would confine the reliability issue to the underlying science, here, electrical engineering and the EMI phenomenon. *See State v. Council, supra* (first gatekeeper decision is whether the underlying science reliable as determined under the factors in *State v. Ford*, 301 S.C. 485, 392 S.E.2d 781 (1990)).

I also agree with the majority's conclusion that the trial court erred in admitting the evidence of unexplained acceleration in other Ford Explorers. Unlike the majority, however, I do not see any meaningful distinction in either the year of manufacture or in the fact that the other models were right hand drive, since the relevant inquiry is whether the Explorers were equipped with identically engineered cruise control and electrical systems. Since, however, the only causal link between these accelerations and that alleged to have occurred here was that of Dr. Anderson's EMI theory, which should not have been admitted, I would hold that this evidence too was wrongfully admitted.

The majority holds the trial court erred in denying appellant's JNOV motion, holding that respondents failed to

"prove [10] that the cruise control system ... was defective or unreasonably dangerous." I note first this exchange between Dr. Anderson and respondents' attorney:

Q. Do you believe that the electrical interference in the Watson accident was the cause of the sudden acceleration?

A. Yes.

Q. And is that to a reasonable degree of engineering certainty?

A. Yes.

In my opinion, this is evidence in the record to support the trial court's denial of appellant's JNOV motion. *See e.g., Amerson v. F.C.X. Coop. Serv., Inc.,* 227 S.C. 520, 88 S.E.2d 605 (1955) (in reviewing denial of directed verdict, all evidence (even that determined on appeal to have been erroneously admitted) must be considered); *Gill v. Ruggles,* 97 S.C. 278, 81 S.E. 519 (1914) (same).

As explained above, I agree that both witness Williams's testimony and that of Dr. Anderson should have been excluded. It was not, however, and the excerpt from Dr. Anderson's testimony alone refutes the majority's conclusion that there was no evidence in the record to support the jury's verdict. I would therefore reverse and remand.

Moreover, the following excerpt from the trial judge's written order denying appellants' JNOV reflect that the verdict was supported by more than the EMI theory alone:

[Appellant] initially contends that the only reasonable inference to be drawn from the evidence is that the [respondents] failed to prove that electromagnetic interference (EMI) caused the sudden acceleration resulting in the subject accident and, therefore, failed to prove that the Watson Explorer was defective and unreasonably dangerous. This argument lacks merit. The [respondents] presented expert testimony that EMI could cause the Next Generation Cruise Control system installed on the Watson Explorer to make

---

**10.** I do not agree with the use of "prove" here, as the respondents need only have presented evidence from which the jury could find the cruise control system caused the accident, not have "proven" that it did to the exclusion of all other causes.

the vehicle suddenly accelerate, and that there were various sources of EMI in the Explorer, including internal sources which [appellant] failed to adequately guard against.[1]

[1] [Respondents'] direct evidence of malfunction alone would be sufficient to support a verdict. Additionally, [respondents] presented direct expert testimony that the malfunction of the cruise control system was caused by EMI. The direct evidence of an EMI caused malfunction was also sufficient to support a verdict for [respondents].

[Respondents] further presented evidence of other similar incidents where Ford Explorer vehicles equipped with the same Next Generation Cruise Control system suddenly accelerated without any apparent cause. Finally, [respondents] presented substantial evidence from which the jury could have could have found that there was no cause for the sudden acceleration that caused the Watson accident, other than a malfunction of the Next Generation Cruise Control system. This evidence, viewed in the light most favorable to the verdict, was easily sufficient to support the jury's express finding that the Next Generation Cruise Control system was defective and unreasonably dangerous, and that it proximately caused Sonya Watson's injuries and Patricia Carter's death.[2]

[2] [Respondents'] expert repeatedly testified that the cause of [respondents'] vehicle suddenly accelerating was EMI. This testimony was supported by the factual testimony that EMI would be corrected if the vehicle was turned off and upon restarting, the cause of the pedal depression would be corrected.

The Court rejects [appellant's] second claim that there is no evidence of a feasible alternative design. [Respondents'] expert testified that, prior to the manufacture and sale of the 1995 Explorer, the Next Generation Cruise Control system could have been designed to reduce or eliminate its vulnerability to EMI, and that such design changes could have been made without impairing the utility of the cruise control, or unduly raising its cost. Additionally, [respondents'] experts testified as to the need for a design change that would stop the sudden acceleration once it occurred which was also supportive of the verdict. This evidence, viewed in light most favorable to the verdict, was easily sufficient to establish a feasible alternative design.

[Appellant's] third contention is that the evidence that the Next Generation Cruise Control system was defective and

unreasonably dangerous was all inadmissible, irrelevant, and highly prejudicial. The admission of both lay and expert evidence, however, is left to the discretion of the trial judge. The Court carefully considered each item of evidence to which Ford raised objections and determined that the evidence was admissible. [Appellant] has raised no argument that persuades the Court that any error was made in the admission of evidence. Assuming arguendo that some of the similar accident evidence should have been excluded, however, the Court notes that the expert evidence alone was sufficient to sustain the jury verdict and, therefore, the admission of such evidence would not have been prejudicial to [appellant].

[Appellant's] fourth and fifth grounds for judgment nov fail as a matter of law. Viewed in the light most favorable to [respondents], the evidence presented was sufficient to eliminate all causes of the sudden acceleration other than an unreasonably dangerous design defect.[3]

[3] Ms. Watson expressly testified that she did not cause the sudden acceleration by keeping her foot on the accelerator and [respondents] presented expert and other evidence that the floor mat did not cause the sudden acceleration. The only remaining explanation for the sudden acceleration was a defect in the cruise control and the jury properly concluded that this must have been the cause of the sudden acceleration.

Accordingly, even if the jury rejected the expert's testimony, the circumstantial evidence was sufficient to support the verdict. [Respondents] were not required to prove a specific defect in the vehicle and could properly prove that the vehicle was defective and unreasonably dangerous using circumstantial evidence. *St. Paul Fire and Marine Ins. Co. v. American Ins. Co.,* 251 S.C. 56, 59–60, 159 S.E.2d 921, 923 (1968) ("[a]ny fact in issue may be proved by circumstantial evidence as well as direct evidence, and circumstantial evidence is just as good as direct evidence if it is equally as convincing to the trier of the facts"); *McQuillen v. Dobbs,* 262 S.C. 386, 391–92, 204 S.E.2d 732 (1974) ("negligence may be proved by circumstantial evidence as well as direct evidence"); *Restatement (Third) of Torts: Product Liability* § 3 Comment c (1998) (*"No requirement that plaintiff prove what aspect of the product was defective.*

The inference of defect may be drawn under this Section without proof of the specific defect").[4]

[4] The Court emphasizes that this is an alternative ruling. The Court finds that [respondents] did in fact present evidence sufficient for the jury to find that a specific defect in the Explorer—the EMI interference which caused the acceleration—proximately caused the accident. With respect to the alternative ruling, however, the Court notes that [appellant's] reliance on cases recognizing that *a malfunction alone* is insufficient to send the case to the jury is misplaced. This case involved evidence of a malfunction *plus detailed evidence negating any cause of the sudden acceleration but a product defect.*

For the reasons given above, I would reverse and remand.