**THIS OPINION HAS NO PRECEDENTIAL VALUE.  IT SHOULD NOT BE CITED OR RELIED ON AS PRECEDENT IN ANY PROCEEDING EXCEPT AS PROVIDED BY RULE 268(d)(2), SCACR.**

**THE STATE OF SOUTH CAROLINA**
In The Court of Appeals

The State, Respondent,

v.

John Kenneth Massey, Jr., Appellant.

Appellate Case No. 2015-002563

———————

Appeal From York County
Paul M. Burch, Circuit Court Judge

———————

Unpublished Opinion No. 2020-UP-183
Heard April 12, 2018 – Filed June 10, 2020

———————

**AFFIRMED**

———————

Appellate Defender Susan Barber Hackett, of Columbia, for Appellant.

Attorney General Alan McCrory Wilson and Assistant Attorney General Mark Reynolds Farthing, both of Columbia; and Sixteenth Circuit Solicitor Kevin Scott Brackett, of York, all for Respondent.

———————

**MCDONALD, J.:**  John Kenneth Massey, Jr. appeals his convictions for malicious injury to property and grand larceny, arguing the circuit court erred in

(1) granting his request to proceed pro se; (2) admitting expert testimony concerning dog tracking; and (3) failing to credit Massey with all of his time served in pretrial detention. We affirm.

**Facts and Procedural History**

Before sunrise on July 17, 2013, Detective Bobby Ferrell, a York County Sheriff's Office (YCSO) civil process officer, was on his way to work when he encountered Massey standing in the middle of a dark country road about twenty yards from a four-wheeler in a ditch at the bottom of an embankment. Massey was sweaty, his clothing was muddy, and his pants were saturated with water.

Massey claimed he was walking to Rock Hill from his girlfriend's father's house in Chester County and that he had called a friend for a ride. When Ferrell asked Massey about the ditched four-wheeler, Massey denied having seen it. Ferrell then pointed his flashlight at the ditch so they could both could see the four-wheeler, and Massey again said he had not noticed it.

Deputy Travis Shealey heard Ferrell call in the incident to dispatch at 5:19 a.m. and arrived at the scene at 5:30 a.m. Shealey, who was familiar with Massey because he had been implicated in a prior theft of the same four-wheeler, noticed a cut-off piece of garden hose tied to the front of the vehicle. Eight additional officers visited the scene prior to the canine tracking team's arrival.

At 6:19 a.m., Deputy Tim Carroll arrived with his canine, Hattie, a bloodhound trained to detect and track human odors. Carroll had Hattie sniff Massey's pant leg before allowing her to search along the road. Carroll testified Hattie picked up a track going from Massey down the side of the road toward the four-wheeler. She then nosed the four-wheeler, turned to the adjacent yard, and headed up the embankment. The area of the embankment was overgrown, and Carroll explained, "You [could] see where somebody had walked up on one side" where the footprints pressed down the grass and "where the tires of the four-wheeler had come down the opposite way." Hattie crossed the yard to a storage shed about fifty yards from the ditch and began to circle around, indicating to Carroll that the track had ended. Carroll and Hattie started "cutting" the area, trying to pick up an exit, but could not find a track headed in any other direction.

Massey was arrested and transported to the detention center, where he continued to claim he was merely walking home and could not have stolen the four-wheeler due to a recent surgery. Officers at the detention center collected Massey's cell phone

and obtained a search warrant for its contents.  The search revealed a number of internet searches for four-wheelers and heavy equipment.  The York County Grand Jury later indicted Massey for grand larceny and malicious injury to personal property.  Both offenses were subject to enhancement as third or subsequent property crimes.

Pretrial, Massey moved to exclude the testimony of the State's proposed dog tracking expert, Deputy Carroll.  The circuit court conducted a hearing to consider the admissibility of the evidence under Rule 702, and following the State's redirect examination of Deputy Carroll, defense counsel notified the court that Massey wanted to personally cross-examine the witness.  After a brief inquiry, the circuit court permitted Massey to proceed pro se, and Massey cross-examined Carroll.

Carroll testified as to both his and Hattie's training and experience, noting Hattie had demonstrated her reliability in completing over three hundred tracking exercises in training and in actual practice.  He recounted how Hattie tracked Massey's scent to the four-wheeler and then to the shed.  On cross-examination, Carroll admitted tracking dogs generally prefer to track a scent from hot to cold and acknowledged Hattie had never performed a reverse tracking training exercise prior to this incident.  Nevertheless, Carroll explained Hattie had been successful in her only reverse tracking training exercise and was capable of reverse tracking a scent up to a mile—a much greater tracking distance than the track in this case.

Following arguments on Massey's motion to exclude, the circuit court found Carroll qualified to testify as an expert witness in the area of canine human scent tracking.  The jury convicted Massey on both charges, and the court sentenced him to consecutive terms of ten years' imprisonment for grand larceny and two years' imprisonment for malicious injury to personal property.

**Law and Analysis**

**I.  Self-Representation**

Massey argues the circuit court erred in permitting him to proceed pro se without adequately questioning him as to his understanding of the dangers and disadvantages of self-representation.  He further asserts the record does not demonstrate he had a sufficient background to intelligently waive his right to counsel.

"Whether a defendant has knowingly, intelligently, and voluntarily waived his right to counsel is a mixed question of law and fact which appellate courts review de novo." *State v. Samuel*, 422 S.C. 596, 602, 813 S.E.2d 487, 490 (2018). "[T]he only basis upon which a circuit judge may deny a defendant's pre-trial motion to proceed *pro se* is if the court determines the defendant has not knowingly, intelligently, and voluntarily waived his right to counsel." *Id.* at 603, 813 S.E.2d at 491; *see also Faretta v. California*, 422 U.S. 806 (1975). "A circuit judge's denial of a defendant's knowing and voluntary request to proceed *pro se* is a structural error requiring automatic reversal and a new trial." *Id.*

When defense counsel announced during the pretrial hearing that Massey wanted to personally cross-examine Deputy Carroll, the circuit court stated Massey "Can't do that, unless he wants to take over his defense and you're out of here." After a short recess, defense counsel reported Massey "indicated after contemplation a decision that he would feel more comfortable with representing himself in this trial." Defense counsel additionally noted Massey asked defense counsel to "assist him, hand him items and serve as sort of an assistant to him," but Massey understood "he would be representing himself at this point." The court stated it needed "to talk [to Massey] about this a little bit" and would provide Massey with standby counsel. The court further warned Massey, "[O]nce you pull the trigger on that, if I agree with it, then [defense counsel] won't be able to go forward with any other question and you'd be on your own, and sometimes representing yourself can be a dangerous proposition."

The circuit court then asked Massey how familiar he was with the court system, to which Massey responded, "Fairly, fairly, Your Honor." Massey reported he spent fifteen years in school, including two years at Winthrop and a semester at York Tech, and was a land surveyor by profession. Thereafter, the court remarked, "And you know the old saying without me quoting it." Massey responded, "Representing himself's [sic] a fool."

Following this exchange, the circuit court asked if Massey was "sure that [he] want[ed] to make this move." Massey responded, "Yes, sir, your Honor. With [defense counsel's] assistance, because some of the stuff that he has we haven't gone over, and I would need him to help me through . . . that as quickly as possible to expedite what [is] here." The court explained, "I have no problem with that, but I need to make sure that you understand that that's strictly what he'd be limited to do now, because you in effect are releasing him from representing [you]." The circuit court noted Massey was educated and "seem[ed] to be very

intelligent" and dismissed defense counsel "as active counsel here." Massey represented himself for the remainder of the pretrial hearing and trial.

Because a criminal defendant's exercise of the right of self-representation entails a waiver of his Sixth Amendment right to counsel, an assertion of such "must be (1) clear and unequivocal, (2) knowing, intelligent and voluntary, and (3) timely." *United States v. Frazier-El*, 204 F.3d 553, 558 (4th Cir. 2000) (internal citations omitted). "Although a specific inquiry by the judge expressly addressing the disadvantages of a *pro se* defense is preferred, the ultimate test is not the trial judge's advice but the accused's understanding." *State v. Cash*, 309 S.C. 40, 42-43, 419 S.E.2d 811, 813 (Ct. App. 1992) (noting factors courts have considered in making this inquiry include: "(1) the accused's age, educational background, and physical and mental health; (2) whether the accused was previously involved in criminal trials; (3) whether he knew of the nature of the charge and of the possible penalties; (4) whether he was represented by counsel before trial or whether an attorney indicated to him the difficulty of self-representation in his particular case; (5) whether he was attempting to delay or manipulate the proceedings; (6) whether the court appointed stand-by counsel; (7) whether the accused knew he would be required to comply with the rules of procedure at trial; (8) whether he knew of legal challenges he could raise in defense to the charges against him; (9) whether the exchange between the accused and the court consisted merely of *pro forma* answers to *pro forma* questions; and (10) whether the accused's waiver resulted from either coercion or mistreatment"). "However, when the trial court fails to expressly make this inquiry, this court will examine the record to determine whether the accused had sufficient background or was apprised of [his] rights by some other source." *State v. Bryant*, 383 S.C. 410, 415, 680 S.E.2d 11, 13 (Ct. App. 2009).

Based on our review of the record as well as our consideration of the *Cash* factors, we find Massey had sufficient familiarity with the judicial system and the dangers of proceeding pro se to knowingly, intelligently, and voluntarily waive his right to counsel. *See e.g.*, *State v. McLauren*, 349 S.C. 488, 496, 563 S.E.2d 346, 350 (Ct. App. 2002) (finding defendant's waiver was knowing and voluntary because "[h]e was advised of his right to counsel, and even though the trial judge did not make a specific inquiry addressing the disadvantages of self-representation, [defendant] had a sufficient background to make a valid waiver under the *Cash* factors").

At the time of trial, Massey was forty years old and had completed approximately fifteen years of school, including two years at Winthrop and a semester at a technical college. Nothing was presented to suggest Massey had any physical or

mental impairments.  Massey had substantial prior experience with the criminal justice system, including previous convictions for twenty separate criminal offenses over a period of eighteen years as well as at least one prior trial experience in March 2015.  Further, although the court did not advise Massey of the sentencing ranges for his offenses or any potential collateral consequences, it permitted defense counsel to provide Massey with limited assistance during the remainder of the pretrial motions and trial.  There is no evidence suggesting Massey's desire to represent himself was the product of coercion or mistreatment, and he met with counsel about his request before the circuit court ruled on his motion to proceed pro se.  Thus, we find Massey knowingly, intelligently, and voluntarily waived his right to counsel, and the circuit court did not err in honoring his request to represent himself.

## II.  Expert Testimony

Massey next argues the circuit court erred in permitting Deputy Carroll to provide expert testimony of Hattie's reverse track from Massey and the four-wheeler to the storage shed because the State failed to establish Hattie's reliability in accordance with *State v. White*, 382 S.C. 265, 676 S.E.2d 684 (2009).  Massey further argues the scene was contaminated by the numerous responding officers, and Hattie had not demonstrated reliability in performing a reverse track prior to this occasion.

During the pretrial hearing, Carroll testified he had worked full-time with YCSO's canine unit for just over seven years and part-time on the response team for two and a half years before that.  One of his canine partners, the bloodhound Hattie, is a "tracking, trailing dog," who began her service to law enforcement when she was almost one year old.  Carroll described Hattie's training as a puppy, her experiences in a week-long YCSO seminar, and her five years of "in-service training" with the YCSO.  Carroll received tracking training during three week-long seminars conducted by the National Bloodhound Association and one week-long YCSO bloodhound seminar, trained in man-tracking without the use of a canine through SLED, and continues to attend in-service training.  Carroll noted he had been qualified as a canine tracking expert witness in a prior circuit court trial.

Carroll described how Hattie generally tracks "when she's locked on a person" and how he could tell if Hattie became distracted during a track.  He explained "if she comes off that track, she'll be quiet, she'll start circling around . . . it until she picks it back up, [and] then she'll start barking again."  Concerning Hattie's track in the current case, Carroll noted that prior to his arrival, "people had walked in the roadway, but from the four-wheeler through the yard . . . was uncontaminated,

nobody had been through there." On cross-examination, Carroll admitted he was uncertain how many officers had entered the roadway area between Massey and the four-wheeler. However, Carroll understood that when Shealey arrived on the scene, "he tried to keep people away from the four-wheeler, away from the house." Carroll stated, "As far as my understanding, nobody had handled the four-wheeler and they kept people out of the yard and out of—out of that particular area."[1]

Carroll testified Hattie "scented off [Massey's] pant leg and cut the—cut the area, searched the area in between him and the four-wheeler and picked up this track going up the roadway to the four-wheeler." When Hattie reached the four-wheeler, she "kind of nosed [it] a little bit, turned up into the yard," continued up the embankment and through the yard. "[S]he tracked around to a storage shed and to the far side where she began circling around, basically that a—that the track stopped at that particular area, didn't have it going any further forward." Carroll stated, "We started cutting it out wider and wider seeing if we couldn't pick up where the—at a different exit point." Carroll opined that "from scenting off [Massey's] pant leg, [Hattie] indicated to me that she followed his track to the four-wheeler and up to where the four-wheeler was taken from."

On cross-examination, Carroll admitted Hattie's training had not typically been focused on reverse tracking a scent from a suspect and only after Hattie tracked the four-wheeler in this case had he conducted such a reverse training exercise with her. Massey also examined Carroll as to evidence from her training file reflecting exercises in which Hattie became distracted or had difficulty following a track. Deputy Carroll acknowledged Hattie had not been certified in tracking or peer reviewed by another agency, and he was unaware of her tracking error rate.

"The qualification of an expert witness and the admissibility of the expert's testimony are matters within the trial court's sound discretion." *State v. Prather*, 840 S.E.2d 551, 559 (S.C. 2020) (quoting *State v. Chavis*, 412 S.C. 101, 106, 771 S.E.2d 336, 338 (2015)). "A trial court's decision to admit or exclude expert testimony will not be reversed absent a prejudicial abuse of discretion." *Id.* (quoting *Chavis*, 412 S.C. at 106, 771 S.E.2d at 338). "An abuse of discretion occurs when the conclusions of the [trial] court are either controlled by an error of law or are based on unsupported factual conclusions." *Id.* (quoting *Chavis*, 412 S.C. at 106, 771 S.E.2d at 338).

---

[1] Deputy Shealey testified that he kept the other officers away from the four-wheeler to avoid contamination prior to the arrival of the canine team.

"All expert testimony must satisfy the Rule 702 criteria, and that includes the trial court's gatekeeping function in ensuring the proposed expert testimony meets a reliability threshold for the jury's ultimate consideration." *White*, 382 S.C. at 270, 676 S.E.2d at 686. "First, the qualifications of the expert must be sufficient, and second, there must be a determination that the expert's testimony will be reliable." *Chavis*, 412 S.C. at 106–07, 771 S.E.2d at 339. Additionally, "the trial court must find that the subject matter is beyond the ordinary knowledge of the jury, thus requiring an expert to explain the matter to the jury." *Watson v. Ford Motor Co.*, 389 S.C. 434, 446, 699 S.E.2d 169, 175 (2010).

In *White*, our supreme court adopted the following evidentiary framework for considering dog tracking evidence, providing such evidence is admissible if:

> (1) the evidence shows the dog handler satisfies the qualifications of an expert under Rule 702; (2) the evidence shows the dog is of a breed characterized by an acute power of scent; (3) the dog has been trained to follow a trail by scent; (4) by experience the dog is found to be reliable; (5) the dog was placed on the trail where the suspect was known to have been within a reasonable time; and (6) the trail was not otherwise contaminated.

382 S.C. at 272, 676 S.E.2d at 687. Finding there was "ample evidence concerning the training and reliability of the dog, Aurie," the court concluded the dog tracking evidence against White met the reliability threshold under Rule 702, SCRE. *Id.* at 271, 676 S.E.2d at 687. Specifically, the court explained:

> Aurie is a German shepherd that descended from a bloodline of known police and military working dogs. Through testing, Aurie has been certified in several areas of tracking, yet Aurie's strongest skill is tracking people. Officer Gunter and Aurie, as of the trial, had been "partners" in excess of seven years and had accomplished approximately 750 tracks together. The finding of reliability is well supported by the record, and we find no abuse of discretion in the admission of the dog tracking evidence.

*Id.*

We find the circuit court in this case did not abuse its discretion in qualifying Carroll as an expert in canine scent tracking and permitting him to testify as to Hattie's tracking path. The evidence established Carroll satisfied Rule 702's qualification requirement, and the bloodhound is a breed of dog characterized by an acute power of scent. Carroll's testimony and the training records indicated Hattie had been trained to follow a trail by scent. During his seven years as Hattie's handler at the YCSO, Carroll trained with her extensively, and she demonstrated reliability in detecting human odor. Hattie's tracking records reflect that she participated in 313 training exercises from 2008–2013, successfully tracking the target without significant difficulty in 286 of these. Of the remaining twenty-seven exercises in which Hattie became distracted or needed correction, she ultimately successfully tracked the target in twenty-four of those. Hattie failed to track the target in only three of the exercises.

Here, Hattie was placed on the scent trail within one hour of Detective Ferrell's calling in the incident, and Deputy Carroll testified he was confident Hattie's track was reliable in this case. Addressing questions concerning reverse tracking as opposed to regular tracking, Carroll explained, "It's still smelling human odor. In something that short of a distance we're not going to notice a difference in her behavior." Moreover, the training for "a back tracker or a reverse track" is the same as that for forward tracking. In her seventy-five tracking excursions with Carroll, Hattie successfully identified her target every time. Although Massey vigorously cross-examined Carroll as to those instances in which Hattie became distracted or "dropped the track," these selected occurrences were drawn from Hattie's full seven-year training file, the sum of which supports the circuit court's reliability finding.[2]

**Conclusion**

For the foregoing reasons, Massey's convictions are

---

[2] It is no longer necessary that we address Massey's argument that the circuit court erred in crediting him with only 140 days served in pretrial detention as opposed to the 566 days of credit he seeks. The State submitted a supplemental record confirming the South Carolina Department of Corrections credited Massey with 582 days of jail time on the sentences at issue in this case. As Massey has received more credit for time served than he seeks, we find his appeal moot as to this issue. *See Sloan v. Greenville Cty.*, 380 S.C. 528, 535, 670 S.E.2d 663, 667 (Ct. App. 2009) ("A case becomes moot when judgment, if rendered, will have no practical legal effect upon the existing controversy.").

**AFFIRMED.**

**HUFF and GEATHERS, JJ., concur.**